**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

UNITED STATES OF AMERICA

v.

JASEN C. MINTER and
LOUIS E. NOCK

CRIMINAL CASE NO.

3:12-cr-00004-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Jasen C. Minter ("Minter") and Louis E. Nock ("Nock"), collectively referred to as "defendants," are charged in a five-count indictment with conspiracy to commit theft of government property, in violation of 18 U.S.C. § 371; embezzlement of government property, in violation of 18 U.S.C. §§ 641 and 2; and concealment of the stolen government property, in violation of 18 U.S.C. §§ 641 and 2. [Doc. 1].[1]  Defendants have filed a motion to dismiss the indictment, [Doc. 19],[2]

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] On May 16, 2012, Nock filed the pending motion to dismiss, [Doc. 19], and on August 1, 2012, Minter moved to adopt Nock's motion, [Doc. 31], which the Court granted on September 27, 2012, [Doc. 49].  Additionally, Nock filed a motion to suppress statements, see [Doc. 18], which the Court deferred to the district court for ruling, see [Doc. 49].

which the government opposes, [Doc. 36].[3]  Also, during the course of pretrial

proceedings, Minter asserted that he suffers from retrograde amnesia, covering a

period of at least twenty years as a result of a head injury he sustained in an

automobile accident on May 11, 2009, see [Doc. 34 at 11; Doc. 46 at 2-3].  The

government therefore moved to have Minter examined to determine his mental

competency to stand trial, [Docs. 41 & 46], and the Court subsequently conducted

a competency hearing on November 14 and 15, 2013, see [Docs. 72 & 73],[4] following

---

[3] Minter filed a reply to the government's response to the motion to dismiss
the indictment, see [Doc. 42], and Nock moved to adopt Minter's reply and also
supplemented the response, see [Doc. 43].  Thereafter, the government moved to file
a sur-reply, [Doc. 44], and then filed its sur-reply, see [Doc. 45].  Subsequently, the
Court provided defendants with an opportunity to respond to the government's sur-
reply, and on October 4, 2012, Minter filed his reply, see [Doc. 50], and the following
day, Nock moved to adopt Minter's reply, see [Doc. 51].  For good cause shown,
Nock's motion to adopt Minter's initial reply brief, [Doc. 43], the government's
motion to file a sur-reply, [Doc. 44], and Nock's motion to adopt Minter's sur-reply,
[Doc. 51], are hereby **GRANTED**.

[4] See [Docs. 82 & 83] for a transcript of the competency hearing held on
November 14 and 15, 2013.  In addition, the parties submitted exhibits at the
competency hearing, which will be referred to as "(Gov. Ex. ___)" for the
government's exhibits and "(Def. Ex. ___)" for Minter's exhibits.  Following the
hearing, Minter moved to supplement the record with his social security
administration file (Exhibit A), a section of the Fifth Edition of the Diagnostic and
Statistical Manual of Mental Disorders published in May of 2013 (Exhibit B), Chapter
Four of a book titled "Neurobehavioral Consequences of Closed Head Injury"
published in 1982 by Oxford University Press (Exhibit C), and a June 29, 2010,
memorandum written by Gary Sussman, Psy.D. ("Dr. Sussman") (Exhibit D).  See
[Doc. 80].  The government has no objection to supplementing the record as to
Exhibits A through C, but it objects to the inclusion in the record of Dr. Sussman's
June 29, 2010, memorandum as not having been properly authenticated under Rule

which the parties filed their briefs, [Docs. 85, 91, & 92].  Minter has also filed a

motion to exclude the expert testimony of Julie Rand Dorney, M.D. ("Dr. Dorney")

and Adriana Flores, Ph.D. ("Dr. Flores"), [Doc. 70], which the government opposes,

[Doc. 86].[5]  For the following reasons, Minter's motion to exclude Drs. Dorney and

Flores' testimony, [Doc. 70], is **DENIED**, and it is **RECOMMENDED** that

defendants' motion to dismiss the indictment, [Doc. 19], be **DENIED** and that

Minter be found **COMPETENT** to stand trial.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.**   <u>**Investigation and Tolling of Statute of Limitations**</u>

The instant five-count indictment arises out of an investigation of defendants

for, among other things, the alleged embezzlement of $2,778,496.00 from the United

States government's bank accounts held in the Saudi American Bank ("SAMBA"),

located in Riyadh, Saudi Arabia in 2006.  <u>See</u> [Doc. 1]; <u>see also</u> [Doc. 36-1].  On

---

901 of the Federal Rules of Evidence and as otherwise not necessary or appropriate
under Rule 106.  <u>See</u> [Doc. 87].  The Court agrees and therefore **GRANTS IN PART**
Minter's motion to supplement the record, [Doc. 80], and supplements the record
with Exhibits A, B, and C, but **DENIES** the motion with respect to Exhibit D.

[5] Minter filed the motion to exclude the testimony of Drs. Dorney and Flores
two days prior to the competency hearing.  <u>See</u> [Doc. 70].  The Court allowed both
experts to testify at the competency hearing, <u>see</u> [Doc. 72], but provided the parties
an opportunity to brief the issue under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509
U.S. 579 (1993).  Subsequently, the government filed its response in opposition to
Minter's motion to exclude.  <u>See</u> [Doc. 86].

October 19, 2011, the government submitted an application for the suspension of the running of the statute of limitations pursuant to 18 U.S.C. § 3292, for offenses arising out of a grand jury's investigation of the defendants.  [Doc. 36-1].  In support of the application, Special Agent David R. Outlaw ("Agent Outlaw"), with the United States Army Criminal Investigation Command, prepared an affidavit, which was presented to the Honorable Timothy C. Batten, Sr., United States District Judge.  [Id. at 1 ¶ 2]; see also [id. at 6-10].  In the affidavit in support of the application, Agent Outlaw detailed the investigation that had occurred and the information discovered up to that point.  [Id. at 6-10].

Specifically, Agent Outlaw relayed that sometime between 2008 and 2009, officials with the U.S. Department of Defense conducted two audits of the U.S. Military Training Mission ("USMTM") Finance Office located in Riyadh, Saudi Arabia, during which it was discovered that approximately $2,778,496.00 was missing from the government's bank accounts with SAMBA and that this money went missing sometime in 2006 when Minter, a Captain with the U.S. Army, was the disbursing officer and Nock, Sergeant First Class with the U.S. Army, was the deputy disbursing officer at the USMTM Finance Office.[6]  [Id. at 7 ¶ 4].  Agent

---

[6] As disbursing officers, defendants were the only individuals authorized to make cash withdrawals from the SAMBA bank accounts during the relevant time. [Doc. 36-1 at 7 ¶ 4].

Outlaw reported that further investigation and a review of SAMBA's bank records revealed that on June 12, 2006, Minter had withdrawn "$144,360 in Saudi Riyals and $1.2 million in U.S. currency in 12,000 $100 dollar bills from the U.S. government's bank account at SAMBA," but that the USMTM Finance Office records did not reflect that the money was ever deposited into USMTM's cash vault as required. [Id. at 7 ¶ 5]. Similarly, the investigation revealed that on August 30, 2006, Minter again "withdrew $1.5 million in 15,000 $100 United States dollar bills and $150,000 in Saudi Riyals from the U.S. government's bank account at SAMBA," but that that USMTM Finance Office records did not reflect that the money was ever deposited into USMTM's cash vault as required.  [Id. at 7 ¶ 6].

Agent Outlaw relayed that Minter returned to the United States in December of 2006, at which time he was assigned to Fort Jackson, South Carolina, but that he was subsequently transferred to Fort McPherson, which is located within the Northern District of Georgia.  [Id. at 7-8 ¶ 7].  When Minter left Saudi Arabia, Nock took over as the Finance and Accounting Officer until he returned to the United States sometime in 2007.  [Id. at 8 ¶ 7].[7]  Agent Outlaw explained that a financial investigation and analysis of defendants' lifestyles revealed that between 2006 and

---

[7] Agent Outlaw explained that during the transition "between Minter and Nock and their successors, military authorities did not conduct any audit of the USMTM Finance Office."  [Doc. 36-1 at 8 ¶ 7].

2008, approximately $197,431.11 in unexplained cash was deposited into the bank accounts of Minter, his wife, and his in-laws, and that during this same time, Minter and his family had acquired various assets, including vehicles, boats, and real property with an additional $50,000 in unexplained cash. [Id. at 8 ¶ 9]. With regard to Nock, approximately $300,000 in unexplained cash was deposited into his and his wife's bank accounts between 2006 and 2009. [Id. at 8-9 ¶ 10].[8]

Based on these facts, Agent Outlaw explained that evidence of the alleged crimes, including SAMBA records and current and former SAMBA employees, appeared to be located in Saudi Arabia, and that on February 28, 2011, the Office of International Affairs ("OIA") of the United States Department of Justice made an official request to the Kingdom of Saudi Arabia ("KSA") for legal assistance in this matter. [Id. at 9 ¶¶ 11-12]; see also [Doc. 36-1 at 12-13; Doc. 45-2].[9] Agent Outlaw also explained that on May 21, 2011, he met with Goolam H. Laher ("Laher"), General Counsel for the SAMBA Financial Group, in Saudi Arabia, and that Laher

---

[8] Agent Outlaw reported that investigators had only been able to account for approximately $800,000 of the $2.8 million in stolen currency. [Doc. 36-1 at 9 ¶ 10].

[9] The February 28, 2011, official request was made pursuant to a formal letter dated January 25, 2011, sent by the OIA to the Ministry of Foreign Affairs for the KSA. [Doc. 36-1 at 12 ¶ 2; Doc. 45-2 at 3-6]. In the letter, the OIA detailed the nature of the investigation involving defendants and provided a brief description of the evidence sought, which included testimony from present and former SAMBA employees and/or officers, including Fahad Al-Athel, Bassim M. Al-Subiheen, and Ahmed Alniam. [Doc. 45-2 at 3-6].

provided him with copies of all relevant SAMBA bank records as well as an oral summary of an internal interview by SAMBA of Mamdouh Al Ali, a SAMBA bank employee.  [Doc. 36-1 at 9 ¶ 13].[10]  After this meeting, Agent Outlaw made an additional request on August 29, 2011, to the U.S. Embassy in Saudi Arabia to interview Mamdouh Al Ali, Mohammed Al-qassim, and Bandar S. Alobedam.  [Id. at 10 ¶ 13].  On October 12, 2011, Agent Outlaw was advised that his additional request had been forwarded to the Saudi Mabahitch, a law enforcement agency in the KSA, on October 11, 2011.  [Id.].  Agent Outlaw relayed that as of the date of the application, October 19, 2011,  he had not yet received a response from any KSA official on either the February 28, 2011, OIA request or the additional October 11, 2011, request.[11]  [Id. at 10 ¶ 14].

On October 25, 2011, Judge Batten entered an Order granting the government's application for suspension of the running of the statute of limitations.

---

[10] During this meeting, Laher advised Agent Outlaw that any formal interview of Mamdouh Al Ali would have to be approved by the Ministry of Interior of the KSA.  [Doc. 36-1 at 10 ¶ 13].

[11] On September 25, 2011, the KSA actually submitted its response to the February 28, 2011, request to the U.S. Embassy in Saudi Arabia, which included summaries of KSA officials' interviews of Fahad Al-Athel, Bassim M. Al-Subiheen, and Ahmed Alniam as well as Bandar S. Alobedam and Mamdouh Al-Ali.  [Doc. 36-3 at 1-3; Doc. 36-4 at 1].  However, the response was not provided to the OIA until December 7, 2011, at which time it was forwarded to the Assistant United States Attorney in this district.  See [Doc. 36-2 at 1].

See [id. at 14-15]. In particular, Judge Batten found that it "reasonably appear[ed], based on a preponderance of evidence presented to the Court, that evidence of the offenses under investigation is located in the [KSA]," and that the OIA "made an official request, as defined in Title 18, United States Code, Section 3292(d), to an 'authority of a foreign country,' namely the [KSA], on or about February 28, 2011." [Id.]. Thus, Judge Batten suspended the running of the statute of limitations, specifically tolling the statute from February 28, 2011, through "the period authorized by Title 18, United States Code, Section 3292(d)." [Id. at 15].

**B.**     **Charges in the Indictment**

On May 1, 2012, the grand jury returned the instant five-count indictment charging defendants with conspiracy to commit theft of government property, in violation of 18 U.S.C. § 371; embezzlement of government property, in violation of 18 U.S.C. §§ 641 and 2; and concealment of the stolen government property, in violation of 18 U.S.C. §§ 641 and 2. [Doc. 1]. Specifically, Count One of the indictment charges defendants with conspiring to commit certain offenses against the United States , namely, embezzlement of government property, beginning no later than June 10, 2006, and continuing to May 8, 2007. [Doc. 1 at 1-5]. The indictment alleges that defendants committed various overt acts in furtherance of the conspiracy, including that on June 10, 2006, Minter sent SAMBA officials an e-

mail stating that he and Nock would be making a visit to deposit a U.S. Treasury check and to make a withdrawal, and that on June 12, 2006, Minter did in fact deposit a U.S. Treasury check in the amount of $10 million and withdrew $144,360.00 in Saudi Riyals and $1.2 million in U.S. currency. [Id. at 4 ¶¶ a-b].

Similarly, the indictment alleges that on August 29, 2006, Minter e-mailed SAMBA officials advising them that he and Nock would be making a visit to make a deposit and withdrawal, and that on August 30, 2006, Minter did in fact deposit $15 million into the USMTM account at SAMBA and withdrew $1.5 million in U.S. currency and $150,000.00 in Saudi Riyals. [Id. at 4 ¶¶ c-d]. The indictment also alleges that on November 21, 2006, Minter completed a Standard Form 1149 for the period between February 20, 2006, and November 21, 2006, which falsely reconciled the dollar amount in the USMTM SAMBA account, thereby concealing the withdrawal of over $2.7 million. [Id. at 4-5 ¶ e]. Thereafter, on December 20, 2006, Nock signed a financial statement for the USMTM SAMBA account, which also concealed the missing funds. [Id. at 5 ¶ f]. Finally, the indictment alleges that on May 8, 2007, Nock sent an e-mail to Minter, see [id. at 5 ¶ g], which states in relevant part:

> This place is in such disarray I do not know what to say. There isn't any more talk, email or discussion about anyone coming over to audit. Menchie is on leave for 6 weeks starting 28 April. Quinn is just learning the system and Stewart is in space. Bottom line is everything

is good.  My email is . . . . If anything should arise, email me there.
Later.

[Doc. 42-1 at 1].

Counts Two and Three charge defendants with embezzlement, in violation of
18 U.S.C. §§ 641 and 2, based on their actions taken on June 12, 2006, and August 30,
2006.  [Doc. 1 at 5-6].  Count Four charges defendants with concealing and retaining
embezzled money, in violation of 18 U.S.C. §§ 641 and 2, between June 12, 2006, and
December 5, 2006, and Count Five charges them with the same offense for the period
between August 30, 2006, and December 5, 2006.  [Id. at 7-8].

C.   **Minter's Competency**

During pretrial proceedings, Minter asserted that he suffers from retrograde
amnesia, covering a period of at least twenty years as a result of a head injury he
sustained in a single-vehicle accident on May 11, 2009, see [Doc. 34 at 11; Doc. 46 at
2-3], and the government therefore moved to have Minter examined to determine
his mental competency to stand trial and for a competency hearing, [Docs. 41 & 46].[12]
Minter was evaluated by Drs. Dorney and Flores, and they provided detailed reports
of their examinations, which were filed under seal with the Court on January 3, 2013.

---

[12] The government specifically requested that Minter be examined by Dr.
Dorney, see [Doc. 41 at 3], and Minter indicated that he had no objection, see [Doc.
46 at 4].

See [Doc. 57].[13]  On November 12, 2013, Minter moved to exclude the testimony of

Drs. Dorney and Flores as irrelevant to the issue of his competency and for failing

to satisfy the requirements of Federal Rule of Evidence 702 and Daubert.  See [Doc.

70].  On November 14 and 15, 2013, the Court held a competency hearing, during

which Minter's medical records were admitted and Dr. Dorney, Dr. Flores,[14] Special

Agent Tammy Cole ("Agent Cole"), Minter, James Lee Powell, Ph.D. ("Dr. Powell"),

and several friends and family members of Minter offered testimony.  See [Docs. 82

& 83].  The parties subsequently filed post-hearing briefs, [Docs. 85, 91, & 92].

---

[13] As will be discussed more fully herein, Drs. Dorney and Flores evaluated Minter and considered several possible psychological diagnoses for his memory loss, and Dr. Dorney concluded that Minter was malingering retrograde amnesia for the years between 1989 and 2009 and that he was competent to stand trial, see [Doc. 57-1 at 9-10], and Dr. Flores found that Minter's self-reported symptoms and information from collateral sources suggested malingering and that current test results indicated that he possessed good verbal skills and memory abilities to learn and retain information whether it was presented verbally or visually, see [id. at 16].

[14] In particular, the Court heard the qualifications of both Drs. Dorney and Flores, see [Doc. 82 at 20-26, 152-56], allowed Minter's counsel to voir dire them, see [id. at 27-30, 156-58], and found them qualified to render their opinions in this case, see [id. at 30-31 ("I am going to find that Dr. Dorney is competent to testify in the field of psychiatry. . . . I will find that she is qualified and allow her to testify as an expert with regard to subject matters at issue in this proceeding."), 159 ("[] I will find that [Dr. Flores] is qualified to render an opinion with regard to those subject matters in the field of clinical and forensic psychology.")].

## II.  DISCUSSION

**A.**   **Defendants' Motion to Dismiss the Indictment, [Doc. 19]**

Defendants move to dismiss the indictment, asserting that the "offenses alleged in counts one through five are outside the five year statute of limitations for non-capital offenses pursuant to 18 U.S.C. § 3282."  [Doc. 19 at 2 ¶ 6].  Specifically, defendants contend that the only conduct charged in Count One of the indictment that falls within the statute of limitations is the May 8, 2007, e-mail from Nock to Minter, which they assert was not an overt act in furtherance of the alleged conspiracy and therefore does not extend the statute of limitations period for that count.  See [Doc. 42 at 1-4; Doc. 50 at 3-5].  In addition, with regard to all of the counts in the indictment, defendants assert that any tolling of the statute of limitations pursuant to 18 U.S.C. § 3292 was improper, and that even if the statute of limitations was properly tolled, the government still failed to indict them prior to the expiration of the statute of limitations.  [Doc. 42 at 4-10; Doc. 50 at 5-6].  The Court will first address defendants' arguments regarding the tolling of the statute of limitations as it finds these issues dispositive of defendants' motion.

### 1.   *Statute of Limitations Properly Tolled Pursuant to 18 U.S.C. § 3292*

The general statute of limitations for non-capital federal offenses such as those charged in the indictment is five years.  See 18 U.S.C. § 3282(a) ("Except as otherwise

expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed."). However, 18 U.S.C. § 3292 "permits the tolling of the limitations period so that the government may pursue an official request for evidence located in a foreign country." United States v. Torres, 318 F.3d 1058, 1059 (11th Cir. 2003). Specifically, § 3292 provides in relevant part:

> Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request[15] has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

18 U.S.C. § 3292(a)(1) (footnote added). Pursuant to § 3292, "a period of suspension . . . shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b); see also Torres, 318 F.3d at 1059 (citation omitted). In any event, "[t]he total of all periods of suspension . . . shall not exceed three years; and [] shall not

_____

[15] An "official request" is defined as "a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country." 18 U.S.C. § 3292(d).

extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section."  18 U.S.C. § 3292(c)(1)-(2).

The indictment, returned on May 1, 2012, charges defendants with various criminal acts committed between June 10, 2006, and May 8, 2007, in Count One; between June 12, 2006, and August 30, 2006, in Counts Two and Three; between June 12, 2006, and December 5, 2006, in Count Four; and between August 30, 2006, and December 5, 2006, in Count Five, all of which are subject to the five-year statute of limitations period set forth in 18 U.S.C. § 3282(a).  See [Doc. 1].  However, on February 28, 2011, prior to the expiration of the five-year statute of limitations, the OIA made an official request to the KSA for legal assistance in which it detailed the nature of the investigation involving defendants and provided a brief description of the evidence sought, which included testimony from present and former SAMBA employees and/or officers.  [Doc. 36-1 at 9 ¶¶ 11-12]; see also [id. at 12-13; Doc. 45-2].  Subsequently, on October 19, 2011, the government submitted an application for the suspension of the running of the statute of limitations pursuant to 18 U.S.C. § 3292, [Doc. 36-1 at 1-13], which was granted by Judge Batten on October 25, 2011, see [id. at 14-15].  Judge Batten suspended the running of the statute of limitations from

February 28, 2011, through "the period authorized by Title 18, United States Code, Section 3292(d)."  [Id. at 15].

Defendants contend that the district court improperly tolled the statute of limitations, asserting that the "government made no showing . . . that the evidence located in Saudi Arabia supposedly was necessary to the bringing of an indictment in this case or that such evidence could be obtained by no other means besides an official request to the [KSA]."  [Doc. 42 at 5].  Defendants further contend that "[p]ermitting the government to toll the statute of limitations, *ex parte*, in any case where supposed 'evidence' happens to be located in a foreign country without any regard for how trivial or irrelevant this 'evidence' may be to the government's case grants the government the unbridled discretion to willfully ignore the statute of limitations in criminal cases whenever it deems it to be convenient to do so."  [Id. at 6].

Defendants' arguments notwithstanding, this issue has been laid to rest by the Eleventh Circuit in United States v. Broughton, 689 F.3d 1260, 1273 (11th Cir. 2012).  In Broughton, the Eleventh Circuit explained in relevant part:

> A plain reading of § 3292 demonstrates that a district court's decision to suspend the running of the statute of limitations is limited to two considerations: 1) whether an official request was made; and 2) whether that official request was made for evidence that reasonably appears to be in the country to which the request was made.

Id. (citation omitted).  If these two considerations are met, "the statute of limitations shall be suspended."  Id. (citation and internal marks omitted).

There is no question that these two conditions were satisfied in this case. Indeed, the government submitted an application with supporting declarations from Agent Outlaw and Dan E. Stigall ("Stigall"), a trial attorney with the OIA, detailing the investigation and the reasonable belief that evidence was located in the KSA, and explaining that an official request for legal assistance had been made to the KSA on February 28, 2011.  See [Doc. 36-1 at 1-13].  Based on the application and supporting declarations, Judge Batten specifically found, by a preponderance of the evidence, that "evidence of the offenses under investigation is located in the [KSA]" and that the OIA "made an official request . . . on or about February 28, 2011."  [Id. at 14-15].

Defendants' "perceived shortcomings regarding the suspension of the statute of limitations here are not only nowhere to be found in § 3292(a), but also contrary to the idea of prosecutorial discretion."  Broughton, 689 F.3d at 1275.  In fact, "[i]t is neither here nor there that the [g]overnment knew of the conspiracy before sending its official requests to [the KSA]; that the conspiracy had terminated before the [g]overnment requested the statute of limitations be tolled; or that none of the evidence requested or obtained by the [g]overnment was needed at trial."  Id. (citation and internal marks omitted); see also United States v. Lyttle, 667 F.3d 220,

225 (2d Cir. 2012) ("Section 3292 does not demand that the foreign evidence sought be pivotal to the indictment; rather, it need only be 'evidence of an offense.'"). Accordingly, having determined that both considerations of 18 U.S.C. § 3292(a) were satisfied, the Court finds that the statute of limitations was properly tolled.

### 2.    *No Final Action by the KSA*

Defendants assert that even if the statute of limitations was properly tolled, "final action" was taken by the KSA on September 25, 2011, when the KSA submitted its response to the U.S. Embassy in Saudi Arabia, and the government therefore had six months from that date (i.e., March 25, 2012) to indict them but waited until May 1, 2012, thereby rendering the charges against them untimely. [Doc. 42 at 7-10].  The government agrees that the KSA submitted a response to the U.S. Embassy in Saudi Arabia on September 25, 2011, but points out that the response was not transmitted to the OIA or the U.S. Attorney's Office until December 7, 2011, and therefore contends that to the extent the response is considered a "final action" by the KSA, the period for tolling did not end until December 7, 2011, and that the charges against the defendants are therefore timely under § 3292.  [Doc. 36 at 10; Doc. 45 at 13-14].  In any event, the government contends that regardless of whether the response date is considered to be September 25, or December 7, 2011, the response was incomplete and therefore does not

constitute a "final action" by the KSA, which, as of the briefing of the motion to dismiss, had still not occurred.  [Doc. 36 at 10; Doc. 45 at 14-15].

"The determination of what constitutes 'final action' for purposes of § 3292 is a mixed question of law and fact." Torres, 318 F.3d at 1061 (citation omitted).  The statute itself "does not define 'final action,'" and "when read in its entirety, the statute does not provide any guidance as to when 'final action' occurs." Id. at 1062 (citation omitted).  However, the Eleventh Circuit has determined that "'final action' for the purposes of § 3292(b) occurs when a foreign court or authority provides a dispositive response to each of the items listed in the government's official request for information." Id. at 1065.[16]

---

[16] While the Court notes that § 3292(b) provides that the period of suspension ends "on the date on which the foreign court . . . takes final action on the request," see 18 U.S.C. § 3292(b), and that other courts have found that "[r]eceipt of documents is neither an action 'on the request' nor one 'taken by the foreign court,'" and that "final action is a dispositive response to a request as determined by the foreign court" rather than "the date received by the Department of Justice," United States v. King, No. 98-CR-91A, 2000 WL 362026, at *17-19 (W.D.N.Y. Mar. 24, 2000) (citations omitted); see also United States v. Meador, 138 F.3d 986, 992-93 (5th Cir. 1998) (rejecting the government's position that "'final action' by the foreign authority takes place when the prosecutor determines that she has received all the evidence responsive to the official request"); United States v. Zaitar, 858 F. Supp. 2d 103, 110 (D.D.C. 2012) (noting that the foreign government responded to the official request as of the date it produced documents and evidence to an agent at the United States Embassy in that foreign country), it need not decide the issue of whether September 25, 2011, or December 7, 2011, constitutes the proper response date since, for the reasons discussed hereinafter, the Court finds in either case that it was not final action taken by the KSA.

18

Defendants assert that the KSA's September 25, 2011, response, see [Doc. 36-3], constitutes a "final action" by the KSA because it responded to each of the items requested in the OIA's February 28, 2011, official request, [Doc. 42 at 8]; see also [Doc. 45-2].[17] While defendants correctly assert that the KSA fully responded to the February 28, 2011, request on September 25, 2011,[18] it is not the end of the story because on August 29, 2011, Agent Outlaw made an additional request to the U.S. Embassy in Saudi Arabia to interview Mamdouh Al Ali, Mohammed Al-qassim, and Bandar S. Alobedam, [Doc. 36-1 at 10 ¶ 13], and on October 12, 2011, he was advised that his additional request had been forwarded to the Saudi Mabahitch, a law enforcement agency in the KSA, on October 11, 2011, [id.].[19] In fact, the initial response from the KSA included the interviews of Mamdouh Al Ali and Bandar S. Alobedam, but failed to make any mention of Mohammed Al-qassim, see [Doc. 36-3], and the KSA has yet to locate and interview Mohammed Al-qassim as requested,

_____

[17] The February 28, 2011, official request sought legal assistance from the KSA by asking that the appropriate KSA officials locate and interview Fahad Al-Athel, Bassim M. Al-Subiheen, and Ahmed Alniam.  [Doc. 45-2 at 3-6].

[18] KSA's response included summaries of the interviews of Fahad Al-Athel, Bassim M. Al-Subiheen, and Ahmed Alniam, among others.  See [Doc. 36-3].

[19] In its application for the suspension of the running of the statute of limitations, the government specifically advised the district court of the February 28, 2011, and August 29, 2011, official requests made to the KSA.  See [Doc. 36-1 at 1-15].

see [Doc. 45 at 14].  Thus, despite defendants' arguments to the contrary,[20] the Court finds that the KSA has not taken any final action in this case as it has not yet provided "a dispositive response to each of the items listed in the government's official request[s] for information."  Torres, 318 F.3d at 1065.[21]  Accordingly, it is hereby **RECOMMENDED** that defendants' motion to dismiss the indictment, [Doc. 19], be **DENIED**.

---

[20] Defendants argue that the government has acknowledged that Mohammed Al-qassim "no longer works for SAMBA bank" and "has yet to be located and interviewed by anyone," and that "tying final action on the part of a foreign government to 'locating' and interviewing an individual that cannot be 'located' would allow the government to indefinitely toll the statute of limitations in any case where a potential witness cannot be found."  [Doc. 42 at 9 (citation and internal marks omitted)].  However, "the statute has a built-in time limitation on the suspension period" in that "the total period of suspension shall in no event exceed three years."  United States v. Hagege, 437 F.3d 943, 955 (9th Cir. 2006) (citation omitted).  Thus, contrary to defendants' suggestion of an indefinite time limitation, § 3292(c)(1) places a three-year limit on the tolling of the statute of limitations, which "safeguards" against the "unlimited discretion" by the government.  Torres, 318 F.3d at 1064; see also United States v. Trainor, 277 F. Supp. 2d 1278, 1284-85 (S.D. Fla. May 19, 2003) (rejecting defendant's argument that the tolling of the statute of limitations ended when the foreign authorities informed the OIA that they could not locate a witness or his firm, finding the foreign authorities had not yet taken final action).

[21] Having concluded that the statute of limitations was properly tolled and that the indictment was timely filed, the Court need not address the parties' arguments regarding Count One, see [Doc. 36 at 7; Doc. 42 at 1-4; Doc. 45 at 1-8; Doc. 50 at 1-5], and whether the May 8, 2007, e-mail constitutes an overt act in furtherance of the alleged conspiracy.

**B.**   **Minter's Motion to Exclude, [Doc. 70]**

Two days prior to the scheduled competency hearing, Minter moved to exclude the expert testimony of Dr. Dorney and Dr. Flores, asserting that their testimony is not relevant to the issue of his competency, that they are not qualified to render opinions as to whether he suffers from retrograde amnesia, and that their testimony is not admissible under Federal Rule of Evidence 702 or Daubert. [Doc. 70]. The Court allowed both experts to testify at the competency hearing. See [Docs. 72 & 82]. Subsequently, the government filed a response opposing Minter's motion to exclude the testimony of Dr. Dorney and Dr. Flores. [Doc. 86]. Minter has not filed a reply to the government's opposition.

**1.**   *Relevancy of Drs. Dorney and Flores' Testimony*

Minter first concedes that he is "certainly aware of the charges against him and their possible consequences as well as possible pleas and plea-bargaining" and that he "understands the roles of the participants at a trial." [Doc. 70 at 3]. However, Minter contends that "[t]he sole reason why [he] is not competent to stand trial is because due to [his] retrograde amnesia he is entirely incapable of assisting [] counsel in his defense." [Id.]. To that end, Minter asserts that the "sole determination that this Court must make . . . is whether [his] assertions regarding his retrograde amnesia are credible," and if so, "whether this condition so impairs

[him] that he is incompetent to stand trial[.]" [Id. at 4].[22]  Minter contends that Drs.

Dorney and Flores' testimony "will in no way benefit this Court in making its

determination as to whether [he] suffers from retrograde amnesia" since neither of

them "have any expertise in retrograde amnesia, traumatic brain injury, or

conversion disorder." [Id. (citations omitted)].

To the contrary, the Court heard the qualifications of both Drs. Dorney and

Flores, see [Doc. 82 at 20-26, 152-56], and found them to be qualified to render their

opinions in this case, see [id. at 30-31, 159].  In particular, Dr. Dorney, a psychiatrist,

testified that she has worked with conversion disorder patients and that she had

dealt with amnesia disorder in several aspects of her psychiatric work, including

from forensic work she has performed for the courts relating to competency as well

as in her general psychiatric practice.  [Id. at 23-24].  Dr. Dorney also relayed that she

had published an article involving conversion disorder patients and that she had

previously testified as an expert in the areas of competency and forensic psychiatry

─────────────

[22] "The Eleventh Circuit has suggested a two-part analysis to evaluate
competency to stand trial: '(1) determination of whether the defendant suffered from
a clinically recognized disorder, and, (2) if so, whether the disorder caused the
defendant to be incompetent.'"  United States v. Ivey, No. CR 112–063, 2012 WL
2502713, at *2 (S.D. Ga. June 7, 2012), adopted by 2012 WL 2502728, at *1 (S.D. Ga.
June 28, 2012) (citation and internal marks omitted) (quoting James v. Singletary, 995
F.2d 187, 188 (11th Cir. 1993) (per curiam)).  Here, Minter alleges he is incompetent
as a result of his retrograde amnesia, and therefore, whether he actually suffers from
retrograde amnesia and if so, whether that amnesia renders him incapable of
assisting his attorney, are key issues before the Court.

at least 136 times, 32 of which specifically dealt with competency to stand trial, as well as in the areas of traumatic brain injury and amnesia.  [Id. at 24-25, 27-29].[23]

In addition, Dr. Flores, a licensed psychologist, testified that she was trained in identifying and treating mental disorders resulting from traumatic brain injuries, that she had treated patients with traumatic brain injuries, that she had been trained in identifying and treating conversion and dissociative disorders and had in fact treated patients with those disorders, and that she had treated multiple patients and evaluated individuals suffering from amnesia.  [Id. at 154-58].  Dr. Flores also stated that she had testified as an expert at least 50 times in the general areas of forensic and clinical psychology, as well as issues relating to competency.  [Id. at 155-56].[24]

_____

[23] Dr. Dorney graduated from the University of Arkansas in 1985 with a degree in chemistry, and she attended medical school at the same university, graduating in 1989.  [Doc. 82 at 21-22].  Dr. Dorney completed her psychiatric residency training at Emory in 1993, and she completed formal forensic training at Emory in 1995.  [Id.].  Since then, Dr. Dorney has been a part of Emory's faculty as an assistant professor in psychiatry, and since 2000, she has been the assistant director of the forensic training at Emory.  [Id. at 22].  Dr. Dorney is board-certified through the American Board of Psychiatry and Neurology, and she is also board-certified in forensic psychiatry.  [Id.].  Although Dr. Dorney has testified regarding issues related to traumatic brain injury and amnesia, she has not written any articles about retrograde amnesia as it related to competency, and she testified that conversion disorder was not usually implicated or related to competency or criminal responsibility since conversion disorder was a "physical or neurologic symptom like blindness[ or] motor functioning sensory malfunctions that [was] related to psychological trauma."  [Id. at 25, 27, 29].

[24] Dr. Flores has been in private practice since 2007.  [Doc. 82 at 153].  She obtained a Bachelor's degree in psychology from the University of Milwaukee in

Drs. Dorney and Flores reviewed Minter's medical records and other collateral information, conducted standard psychological testing, and evaluated Minter prior to rendering their opinions that the totality of Minter's case suggested malingering retrograde amnesia, see [Doc. 57-1], opinions the Court found at the competency hearing that they were qualified to render, see [Doc. 82 at 30-31, 159]. Accordingly, the Court rejects Minter's argument that Drs. Dorney and Flores' testimony is "wholly irrelevant" to the issue of his competency.

---

1990, and she obtained her Master's degree and doctorate in clinical psychology from Miami University in Ohio in 2000. [Id. at 153-54]. Dr. Flores completed one year of a psychological internship from 1999-2000, and she completed a post-doctoral fellowship at Emory School of Medicine in the Behavioral Science and Psychiatry department from 2000 to 2001, and she currently is an adjunct assistant professor at Emory. [Id.]. She testified that identifying and treating mental disorders resulting from traumatic brain injuries has been a part of her training and that she has treated patients with traumatic brain injuries, though she has not written or conducted any specific studies on that subject matter. [Id. at 154, 157-58]. She also stated that she has received training in identifying and treating conversion and dissociative disorders, and in fact, has treated patients with such disorders, though she has not written or performed any clinical studies on conversion disorder. [Id. at 154-55, 157-58]. Dr. Flores further stated that she has treated multiple patients suffering from amnesia, has been asked to evaluate individuals claiming to suffer from amnesia, and has found some of those individuals to actually be suffering from amnesia. [Id. at 155-56]. When asked if she had testified on conversion disorder as it related to competency, Dr. Flores stated that she has not had any such cases, nor has she testified regarding retrograde amnesia in the context of competency. [Id. at 158].

### 2.   *Admissibility under Rule 702 and Daubert*

"'Federal Rule of Evidence 702, as explained by the Supreme Court in [Daubert] and its progeny, controls determinations regarding the admissibility of expert testimony.'"   United States v. Diaz, No. 07-20398-CR, 2008 WL 906725, at *1 (S.D. Fla. Mar. 28, 2008) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  Specifically, Rule 702 provides that an expert witness may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.   "'The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case.'"   Diaz, 2008 WL 906725, at *2 (quoting United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

In Daubert, the Supreme Court "emphasized the district court's 'gatekeeping' role to ensure that scientific testimony is relevant and reliable before it is admitted

as evidence." <u>Wright v. Case Corp.</u>, No. Civ.A.1:03CV1618-JEC, 2006 WL 278384, at *2 (N.D. Ga. Feb. 1, 2006) (citation omitted) (quoting <u>Daubert</u>, 509 U.S. at 589). The <u>Daubert</u> opinion identifies several factors that may be relevant in determining the admissibility of expert testimony under Rule 702: "(1) whether the theory or technique can and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) what the theory or technique's known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether the expert's theory or technique is generally accepted in the field." <u>Diaz</u>, 2008 WL 906725, at *2 (citing <u>Daubert</u>, 509 U.S. at 593-94).

"The *Daubert* inquiry is a flexible one, giving district courts great latitude in determining which of the *Daubert* factors, if any, are appropriate in assessing the admissibility of expert testimony in a particular case." <u>Id.</u> (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999) ("noting that '*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.'")). "'Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his or her testimony.'" <u>Id.</u> (alteration in original) (citation and internal marks omitted) (quoting <u>United States v. Brown</u>, 415 F.3d 1257, 1268 (11th Cir. 2005)). Therefore, the Court has "considerable leeway in deciding in

26

a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., 526 U.S. at 152.

Minter contends that Drs. Dorney and Flores' testimony that he is malingering[25] is a "credibility determination [that] falls within the exclusive province of this Court, and that determination is not aided by the unqualified expert testimony offered in this case." [Doc. 70 at 8]. Minter further argues that the government "will not be able to satisfy [its] burden" to show "that the methodology by which Dr. Dorney and [Dr.] Flores reached their conclusions is sufficiently reliable." [Id.]. As to Minter's first argument, the Court has already concluded that Drs. Dorney and Flores are qualified and that their testimony is relevant to the competency issues before the Court. "Properly qualified expert witnesses may testify regarding their specialized knowledge in a given field if it would assist the trier of fact to understand the evidence or to determine a fact in issue." United States v. Paul, 175 F.3d 906, 911 (11th Cir. 1999) (citations and internal marks

_____

[25] The DSM-IV defines malingering as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. . . . Malingering should be strongly suspected if any combination of the following is noted: (1) medical legal context of presentation (e.g. the person is referred by an attorney to the clinician for examination), (2) marked discrepancy between person's claimed stress or disability and objective findings; . . . (4) the presence of antisocial personality disorder." United States v. Battle, 235 F. Supp. 2d 1301, 1306-07 (N.D. Ga. 2001) (alterations in original) (citation and internal marks omitted).

omitted); see also United States v. Burchfield, 719 F.2d 356, 357 (11th Cir. 1983) (finding expert testimony admissible where it is "the kind that enlightens and informs lay persons without expertise in a specialized field").  Indeed, while the "determination of competency is a legal conclusion. . . . in reaching a competency determination, the court may consider the testimony of medical experts to establish facts[.]"  United States v. Merriweather, 921 F. Supp. 2d 1265, 1303 (N.D. Ala. 2013) (footnotes and citation omitted).  Here, the experts' opinions are based on their knowledge, specialized training, and experience as well as their review of Minter's medical records and their evaluation of him, which compels the conclusion that this expert testimony is admissible.

Moreover, while Minter generally challenges the reliability of the experts' opinions at issue, see [Doc. 70 at 8], the method employed by these experts in rendering their opinions is a common method typically utilized by experts in cases such as this.  See Discepolo v. Gorgone, 399 F. Supp. 2d 123, 127 (D. Conn. 2005) (footnote omitted) (noting that "psychological testing, record review, and other interviewing, is a generally accepted methodology in the community of psychiatrists and psychologists for making a medical diagnosis").  Even Minter's own expert, Dr. Powell, agreed that in making a determination as to whether an individual is malingering, mental health professionals typically evaluate the individual, review

28

the medical reports, review the scientific literature, and consider collateral sources.
See [Doc. 83 at 189].  Thus, Minter's motion to exclude the expert testimony, [Doc. 70], is **DENIED**.

## C.    <u>Competency to Stand Trial</u>

Minter asserts that he suffers from retrograde amnesia as a result of an automobile accident in May of 2009.  The government contends that Minter does not actually suffer from retrograde amnesia, but is malingering, and that even if his claims of amnesia are credible, he is still competent to stand trial.  <u>See</u> [Docs. 85 & 92].  Minter responds that the government has failed to prove by a preponderance of the evidence that he is malingering his amnesia, and that it has failed to meet its burden to show that he is competent to stand trial.  <u>See</u> [Doc. 91].  The following is a summary of the evidence and testimony presented at the competency hearing.

### 1.    *Minter's Medical Records*

On May 11, 2009, Minter was admitted to the Atlanta Medical Center ("AMC"), following a single-vehicle accident in which his truck struck a pole near a railroad crossing.  (Gov. Ex. 6; Def. Exs. A & A1).[26]  The AMC medical records

---

[26] A photograph taken of the truck following the accident depicts damage to the front of the truck, primarily on the passenger side, where it struck the pole.  <u>See</u> (Gov Ex. 14); <u>see also</u> (Def. Ex. A1).  Minter was wearing his seatbelt and it appears that the airbag was not deployed, though there is some discrepancy about this in the records.  (Def. Ex. A at 7).

indicate that Minter "had positive loss of consciousness and altered mental status at the scene" and that he "did not have any memory of the accident, did not know how to do his job[, and did] not recall being in the Army."  (Gov. Ex. 6 at 2; Def. Ex. A at 2-3, 5).[27]  Upon admission, claimant's Glasgow Coma Scale rating was 14 out of a total of 15.  (Gov. Ex. 6 at 3).[28]  A CT scan and MRI of Minter's brain revealed no abnormalities, and he was transferred from the intensive care unit to the floor on May 13, 2009.  (Gov. Ex. 6 at 2; Def. Ex. A at 2, 19-21).  Minter's "functional testing was within normal limits, except for [his] retrograde amnesia,"[29] and he was

---

[27] It was noted that Minter's recent memory was impaired and that his remote memory was likewise impaired and that he was "confused about [his] job and address."  (Def. Ex. A at 7-8, 17).  Another AMC medical record noted that Minter's speech was clear, but that he was confused in that he stated he was not in the Army and was not married when he was in fact a Major in the Army and was married with children.  See (Def. Ex. A at 14, 16).  Minter was able to recall "the answers people have told him."  (Def. Ex. A at 16).

[28] "The Glasgow Coma Scale measures a person's conscious state.  A score of 3 on the scale indicates that the subject is in a deep coma, while a score of 15 indicates that the subject is fully awake."  Luke v. United States, No. 1:09CV52 CDP, 2011 WL 2413962, at *2 (E.D. Mo. June 10, 2011).

[29] It was noted by speech pathology on May 13, 2009, that Minter was suffering from memory deficits and/or amnesia, but that his "presentation [was] inconsistent [with his] current injury[.]"  (Def. Ex. A at 11).  It was further noted that he was missing pieces of his memory from the age of 16 to current, which was "inconsistent."  (Def. Ex. A at 17).  Prior to his discharge, he complained of a headache and was administered pain medication, see (Def. Ex. A at 11-12); however, he was not prescribed any medications at discharge, see (Gov. Ex. 6 at 2; Def. Ex. A at 2).

discharged home on May 13, 2009, with recommendations that he follow up with outpatient speech and physical therapy, if needed.  (Gov. Ex. 6 at 2; Def. Ex. A at 2).

Following Minter's discharge from the AMC, he sought outpatient treatment for his "cognitive and functional deficits" from the Shepherd Center from May of 2009 through October of 2009.  See (Gov. Ex. 7; Def. Exs. B-H).  On May 21, 2009, Minter presented to the Shepherd Center's SHARE Initiative Clinic for his initial evaluation with Darryl Kaelin, M.D. ("Dr. Kaelin"), and Dr. Kaelin noted that Minter had been involved in a single car accident in which he had lost consciousness, that he was not found to have any "notable deformities about the head or neck," though he complained of head and neck pain, and that "[b]ecause of continued confusion and retrograde amnesia it was recommended that [he] follow up with speech therapy for further evaluation."  (Def. Ex. B at 1).  Dr. Kaelin also noted that Minter reported that since his discharge from the AMC, he has had "about a 22-year period of retrograde amnesia," that he recalled "things from birth up to the late 80s but recall[ed] basically nothing from the 90s and early 2000," that his "last solid memory before the accident was about 4 days before," that his "last total memory of any type was taking his kids to school the morning before the accident," and that his "first memory after waking up was being in the emergency room but his first lasting memory was being in the ICU that night." (Id.).  Minter reported that he had an

"understanding and recollection of how to perform certain activities such as using a fax machine and I-phone," that he recognized his wife and children but did not recall significant events such as the birth of his children or any vacations that they had taken, that he did not recall graduating college, that his day-to-day cognition was "okay," and that he was working in the military and knew his job description but did not know "how to work the job and [did] not recall any of the procedures." (Id.). Minter reported that he had heightened senses, sensitivity to light and sound, that he was suffering from headaches located in three distinct spots, and that he had numbness in the left side of his face. (Id.).

Upon physical examination, Dr. Kaelin noted that claimant was fluent in his speech, that he had some tenderness over his left frontal temporal region and right suboccipital musculature but that there was no swelling or deformity noted, that he had symmetrical and normal strength in both his upper and lower extremities, that he was able to recall 3/3 objects at 1 and 5 minutes, that he could repeat 7 digits forward and 4 digits backwards on the second attempt, that he could follow 3-step commands, that his problem-solving skills were generally intact, and that he had some cognitive and functional deficits secondary to suspected traumatic brain injury. (Def. Ex. B at 2). Dr. Kaelin's impressions at this time were that Minter's "deficits may be consistent with right hemispheric damage although his type of

retrograde amnesia [was] quite unusual given his fairly high level of cognitive function," that he had adjustment disorder with anxious mood, that he had insomnia, and that he was suffering from post-traumatic headache that appeared primarily tension or myofascial in nature. (Id.). Dr. Kaelin explained to Minter and his wife that Minter's symptoms "should gradually improve and that he should not become overly anxious about his temporary loss of function as this may contribute to overall worsening of his condition." (Id.). Dr. Kaelin also prescribed Minter several medications, and recommended that he undergo psychological testing, physical and occupational therapy, and a speech evaluation. (Id.).[30]

---

[30] From May 26, 2009, through May 29, 2009, Minter underwent a comprehensive evaluation to assess his current level of functioning. (Def. Ex. C). Minter's strengths were noted as motivation, supportive family, independence with activities of daily living, functional mobility, level of education, pre-injury work history, functional balance, and functional vision, but he was found to have mildly impaired lower extremity coordination, balance, and endurance. (Def. Ex. C at 1-2). His adjustment and coping skills, family therapy and support, brain injury education, and symptom management were noted as moderately impaired and he was found to be mildly impaired with regard to anxiety and stress management. (Def. Ex. C. at 2-3). He was noted as having mild impairments in certain categories under executive functioning skills and was found to be moderately impaired with regard to his cognitive endurance. (Def. Ex. C at 3). However, Minter's functional language skills were within functional limits. (Id.). It was noted that Minter's fine motor strength and coordination in his upper extremities were mildly impaired. (Def. Ex. C at 4). It was recommended that Minter attend counseling sessions once a week, that he attend vocational therapy once a week, and that he would benefit from physical, occupational, speech, and recreation therapy services. (Def. Ex. C at 6).

On June 4, 2009, claimant saw Dr. Kaelin for a follow-up from his initial evaluation and Dr. Kaelin noted that claimant's evaluations in the SHARE program showed "good functional ability" and "good functional progress in all areas." (Def. Ex. E at 1).[31] Minter described his headaches as "only mild in nature with occasional shooting pain that lasts for just a few seconds," and he reported that he was able to read and concentrate for a longer period of time. (Id.). Dr. Kaelin noted that Minter had undergone neuropsychological testing and that although he had not seen the official results, he had spoken with a clinical psychologist present at the time and that it appeared Minter "showed mild deficits consistent with possible organic brain injury," and that his "retrograde amnesia appear[ed] to be most consistent with conversion disorder." (Id.). Dr. Kaelin's impressions at this time were "[h]igh-level cognitive and functional deficits secondary to post concussive syndrome," [r]etrograde amnesia that [was] difficult to explain base[d] on his injury and most

---

[31] A Shepherd Pathways Team Report dated June 15, 2009, revealed that Minter was discharged from occupational and physical therapy services on June 12, 2009, and that speech therapy intended to discharge him on June 19, 2009, with the primary focus being on him continuing counseling for memory retrieval. (Def. Ex. D at 1). It was also recommended by vocational therapy that Minter "return to work in his position with the Army gradually" and that it appeared that "he may be able to learn new tasks at this time, but he would need to transition into a working environment/duties gradually due to mental fatigue." (Def. Ex. D at 5). It was also recommended that a counselor would go with Minter to Fort McPherson "to address anxiety and returning to work and re-entering his previous working environment to see if any memories [could] be triggered." (Id.).

likely related to emotional sequelae and possible conversion disorder," adjustment disorder with anxious mood, insomnia, and post-traumatic headache.  (Id.).  Dr. Kaelin adjusted Minter's medicinal regimen and recommended that he continue with his treatment program and counseling.  (Id.).

On June 5, 2009, Stephen N. Macciocchi, Ph.D. ("Dr. Macciocchi"), issued his report from his neuropsychological evaluation of Minter's functioning and current neurocognitive skills.  (Def. Ex. F).  Dr. Macciocchi conducted a clinical interview of Minter and administered him several tests, including the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), the Wechsler Test of Adult Reading, the Category test, the Trail Making test, the Benton Visual Form Discrimination test, the Boston Naming test, the Controlled Oral Word Association test, the Finger Tapping test, the Wechsler Memory Scale-IV, the California Verbal Learning Test-II, the Millon Clinical Multiaxial Inventory-III, the Victoria Symptom Validity test, and the Medical Symptom Validity test.  (Def. Ex. F at 1).  During the clinical interview, Dr. Macciocchi observed that Minter was alert, oriented, and cooperative; that his affect was normal; and that he "did not evidence or report any significant neuropsychiatric or neurobehavioral symptoms."  (Def. Ex. F at 3).  He further observed that Minter "demonstrated no impairment in antegrade learning during [the] interview or the assessment."  (Id.).

Test results showed that Minter's verbal comprehension score placed him in the average range on the WAIS-IV and that his perceptual reasoning was in the low average range.  (Def. Ex. F at 1).  Dr. Macciocchi found that Minter fell in the moderately impaired range on the Category test, and that his "ability to generate hypotheses and solve problems effectively and efficiently under conditions of uncertainty was impaired based on normative expectations as well as expectations derived from his educational and occupational history."  (Def. Ex. F at 2).  Minter's full scale IQ score on the Wechsler Test of Adult Reading placed him in the average range as was his working memory index, but his processing speed index was "significantly impaired" and his performance on the Trail Making test revealed moderate impairments in simultaneous and alternating attention.  (Id.).  Minter's fine motor speed and dexterity were moderately to severely impaired using his dominant and non-dominant hands, but he had no visual impairments and his speech was "fluent with no evidence of paraphasias or dysnomia."  (Id.).

With regard to Minter's memory functions, Dr. Macciocchi noted  that he had "generally average immediate story memory," low average delayed story memory, that his visuospatial recall was mildly impaired following a short delay and low average following a long delay, that his verbal learning was average, and his short and long-delayed spontaneous recall were low average.  (Def. Ex. F at 2-3).  Dr.

36

Macciocchi observed that Minter "exerted adequate effort on tasks simulating memory tasks," that testing "revealed a profile suggesting elevated desirability," that he "evidenced an elevation on the compulsive personality scale," that his "responses suggest[ed] he tend[ed] to be somewhat compulsive in his approach to life," and that he was "not only cognitively constricted but also interpersonally respectful and he appear[ed] to have a stable self-image."  (Def. Ex. F at 3).

Dr. Macciocchi's impressions were that Minter had "sustained what appear[ed] to be a mild traumatic brain injury" and that his "current examination document[ed] impairment in a number of neurocognitive functions which are difficult to explain based on his injury history as well as his premorbid functioning."[32]  (Def. Ex. F at 3-4).  Dr. Macciocchi opined that Minter's retrograde amnesia was "difficult to explain based on his injury history," noting that "[p]ersons who experience similar symptoms typically evidence improvement in weeks to months."  (Def. Ex. F at 4).  He further opined that "[t]he basis for [Minter's] loss of memory of 2 decades cannot be completely explained by his injury history, but there [was] no doubt he sustained a mild traumatic brain injury as a result of his accident,

---

[32] Dr. Macciocchi noted as an example that Minter's educational and occupational history suggested "considerable success and accomplishment and his current IQ score fell in the low average range."  (Def. Ex. F at 4).  He also noted that Minter evidenced "impaired motor functioning but he ha[d] no history of an injury which would be expected to cause slowing in fine motor speed and dexterity."  (Id.).

at least based on medical records and [] Minter's self-report." (<u>Id.</u>).  Dr. Macciocchi recommended multidisciplinary therapy, with a primary focus on "assisting him in becoming more functional cognitively and behaviorally despite his self-reported amnesia." (<u>Id.</u>).

Minter returned to see Dr. Kaelin for a follow-up evaluation on July 2, 2009, at which time he reported "doing quite well."  (Def. Ex. G at 1).  Minter reported having two periods of spontaneous memory recovery since his last appointment, but that he still had "large gaps in his memory for about 20 years prior to the injury." (<u>Id.</u>).  At this time, Dr. Kaelin's impressions were cognitive functional deficit secondary to post-concussive syndrome, resolving retrograde amnesia, resolving adjustment disorder with anxiety, and intermittent headache. (<u>Id.</u>). Minter returned on July 9, 2009, at which time he was still doing well.  (Def. Ex. G at 3).  On September 10, 2009, Minter saw Dr. Kaelin and reported that he had started working on a part-time basis and that it was "generally going well," but that he had "not seen any significant improvement in his periods of memory that still date back to the late 80s." (Def. Ex. G at 5).  On September 28, 2009, Minter was discharged from the day program, but would continue individual and vocational counseling.  (Def. Ex. G at 7).

On October 1, 2009, Minter saw Dr. Kaelin for a follow-up appointment and reported that he was working four days per week with some full days, but that he was confused because he had "no real assignment when he goes to work and so he usually brings in his computer and works on it." (Def. Ex. H at 1). Upon examination, Dr. Kaelin observed that Minter had 5/5 strength in his upper and lower extremities with normal sensation and reflexes, that he could go from sit to stand independently, and that he could ambulate without antalgia, weakness, or loss of balance. (Id.). Dr. Kaelin noted that Minter's cognition was intact to conversational confrontation "with the exception of recollection of information from the time between his accident dating back to 1988." (Id.). Dr. Kaelin's impressions were post-traumatic retrograde amnesia following possible closed head injury, which he found to be a "highly unusual phenomenon [] likely related to conversion disorder, or factitious etiology," resolved adjustment disorder with anxious mood, and mild to moderate intermittent headache managed with Midrin. (Id.). Dr. Kaelin recommended that Minter follow up on his continued mental health issues and continue counseling, but that he no longer needed occupational or physical therapy. (Def. Ex. H at 1-2).

Following his discharge from the Shepherd Center, Minter was referred to Dr. Sussman, a psychologist at Fort McPherson's Lawrence Joel Army Health Clinic.

(Def. Exs. I-K).  Minter saw Dr. Sussman on October 2, 2009, at which time it was noted that his chief complaint was memory loss.  (Def. Ex. I at 2).  Minter relayed that he had "no clear duties at work," that he felt "'stupid' and anxious when he fail[ed] to recognize others who [knew] him or when asked for information specific to the Army that he [did] not know, but should know because of his rank," that he dreaded going to work, and that he was bothered that he did not feel close to his family or that he did not "readily know specific information about his children." (Def. Ex. I at 7).  Minter reported having "no prior knowledge of the internet because when [he] was growing up [he] didn't have the internet, but finds it an amazing tool."  (Id. (internal marks omitted)).  He also reported that his marriage was "good" and that he was "very interested in physical intimacy with his wife," but that she had told him that "most couples who have been married for fourteen years are not intimate as frequently as he would like to be."  (Id.).  He described feeling like a newlywed.  (Id.).  With regard to his memory loss, Minter stated, "I don't know . . . a brain shear . . . Dr. Kaelin (physician at the Shepherd Center) says it should go back . . . the islands will begin to connect . . . Terri (his counselor at the Shepherd Center) says I'm like the Jason Bourne of the Army . . . if it is a traumatic experience, I don't know if I want to remember it . . . I have trouble with recall . . . I don't think like an 18 year old."  (Id. (alterations in original)).

Dr. Sussman noted that Minter's condition was regarded as stable, that he appeared "able to form new memories and there [was] new learning for novel information," and that he had "anxiety in response to loss of confidence in his ability to respond to requests for military-specific information." (Id.). Dr. Sussman further concluded:

> From consideration of all that is known about the patient, diagnostic considerations include dissociative amnesia, amnestic disorder due to head injury (although disorientation to self is rare in this condition), amnestic disorder not otherwise specified and cognitive disorder not otherwise specified. Dissociative amnesia is strongly suspected.

(Id.).[33]

On November 10, 2009, Dr. Sussman completed an Interdisciplinary Behavioral Health assessment of Minter. (Def. Ex. K).[34] Minter's chief complaint to

---

[33] On October 22, 2009, Minter e-mailed Dr. Sussman and relayed that it was the first day he was wearing his Army uniform and that he felt helpless because he felt "more at risk of someone approaching [him] to ask [him] something about the Army/[his] job." (Def. Ex. J at 3). Dr. Sussman responded by thanking him for keeping him in the loop and noting that it was a huge step that showed his courage and determination. (Id.).

[34] In preparation of this assessment, Dr. Sussman reviewed Minter's records provided by the Shepherd Center, including Drs. Kaelin and Macciocchi's records; had a telephone consultation with Terri Kohn, Minter's primary counselor at the Shepherd Center, who did not believe that Minter was feigning memory loss, though she reported that she had accompanied Minter to a meeting during which he was informed that he was under investigation; and had telephone consultations with Minter's co-workers in the Army, including Minter's Company Commander who advised Dr. Sussman that Minter was informed in July, 2009, that he was under investigation, and his supervisor at the time of the car accident who stated that he

Dr. Sussman was that he did not "really remember being in the Army," but that he had "faith it [would] come back . . . [He] want[s] to get [his] life back . . . [He] [doesn't] have the historical knowledge . . .[He's] a private with a lot of rank." (Def. Ex. K at 4).  Minter also reported that although he did not smoke, he has had a cigarette taste in his mouth since his injury.  (Def. Ex. K at 5).  He further reported that he was questioned on November 2, 2009, for "'theft and conspiracy in 2006 in Saudi Arabia'" for having "'stolen 2.8 million dollars,'" that his wife was also questioned on the same day and told that her husband was being investigated for "theft, selling alcohol and running a prostitution ring," and that he had a history of gambling, but stopped "after a 'big blow up with [his] wife.'"  (Id. (alteration in original)).

Upon a mental status exam, Dr. Sussman observed that Minter was appropriately dressed in civilian attire,[35] fully alert, oriented in all spheres, had no unusual peculiarities, was tearful when discussing not being able to recognize his daughter after the injury, was cooperative, displayed an anxious mood, had logical and relevant thought processes though he was suspicious that others did not believe

---

did not believe Minter was feigning memory loss.  (Def. Ex. K at 1-3).

[35] Dr. Sussman noted that Minter preferred "not to leave his workspace dressed in uniform because he worrie[d] about embarrassing himself by saluting incorrectly or not being able to recognize others who say they know him.]" (Def. Ex. K at 6).

he was credible, and had a good understanding of his current problems and how to resolve them "as evidenced by awareness that his memory loss [was] atypical and not [] fully explained by his injury history."[36] (Def. Ex. K at 6-7 (emphasis omitted)). Dr. Sussman further observed that Minter's capacity to exercise sound judgment was good, "as evidenced by his decision to continue treatment and comply with treatment recommendations." (Def. Ex. K at 7 (emphasis omitted)).

Dr. Sussman summarized Minter's injury and associated condition and noted that there had been several spontaneous memories within the last six months that were verified by family members, and that Minter still had no memory of his involvement in the military. (Id.). Dr. Sussman also noted that "[t]hose who have worked with [Minter] at the Shepherd Center opine[d] that his amnesia [was] most likely related to conversion or factitious etiology." (Id.). Dr. Sussman explained that Minter had returned to work at Fort McPherson, but that it had not prompted any recall of personal information. (Id.). He noted that Minter had been questioned about misconduct he allegedly committed in 2006 while he was serving as a finance officer in Saudi Arabia and that there were no neurological or psychological

---

[36] Dr. Sussman noted that in addition to his most recent concussion, Minter reported that he had been hospitalized overnight when he was 12 years old after he hit his head on the edge of the pool. (Def. Ex. K at 4). Minter also reported that he thought he had suffered concussions during parachute jumps early in his Army career. (Id.).

problems at the time of the alleged misconduct.  (Id.).  Minter reported to Dr.

Sussman that he was "motivated to regain his memory in order to defend himself

against allegations of misconduct."  (Id.).

Dr. Sussman concluded that Minter was "unfit for full duty."  (Id.).  Dr.

Sussman's diagnostic impressions were Axis I: an unspecified amnestic disorder,

provisional, as evidenced by a six-month period of significant retrograde amnesia

not fully explained by Minter's injury history, but that there were no deficits in

learning or recalling new information; Axis II: no diagnosis; Axis III: headache; Axis

IV: military, legal and family stressors; and Axis V: a current Global Assessment

Functioning ("GAF") Scale Score of 50.[37]  (Def. Ex. K at 7-8).  Dr. Sussman released

---

[37] "The DSM-IV uses a 'multiaxial system,' which 'facilitates comprehensive
and systematic evaluation with attention to the various mental disorders and
general medical conditions, psychosocial and environmental problems, and level of
functioning that might be overlooked if the focus were on assessing a single
presenting problem.'"  Jackson ex rel. K.J. v. Astrue, 734 F. Supp. 2d 1343, 1348 n.5
(N.D. Ga. 2010), adopted at 1345 (quoting Am. Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 27 (4th ed. Text Revision 2000)).  "First, Axis
I is for reporting all the various disorders or conditions in the Classification except
for the Personality Disorders and Mental Retardation (which are reported on Axis
II)."  Id. (citation and internal marks omitted).  "Axis II is for reporting Personality
Disorders and Mental Retardation.  It may also be used for noting prominent
maladaptive personality features and defense mechanisms."  Id. (citation and
internal marks omitted).  "Axis III is for reporting current general medical
conditions that are potentially relevant to the understanding or management of the
individual's mental disorder," and "Axis IV is for reporting psychosocial and
environmental problems that may affect the diagnosis, treatment, and prognosis of
mental disorders (Axes I and II)."  Id. (citations and internal marks omitted).  The
GAF rating scale, the fifth axis, assesses how well the individual is able to function

Minter without limitations and recommended that he continue follow up care. (Def. Ex. K at 8).

On November 19, 2009, Minter saw Scott Mooney, Ph.D. ("Dr. Mooney"), a neuropsychologist at the Dwight D. Eisenhower Army Medical Center, for a neuropsychological evaluation at the request of Dr. Sussman. (Gov. Exs. 8 & 8A; Def. Ex. L at 2). Dr. Mooney detailed Minter's background information and noted that when he asked Minter about the accident, Minter relayed that he "remembered a few details from the four days preceding the accident, including taking his children to school just before the crash occurred," and that he did not "remember other events and experiences spanning 20-22 years before then[.]" (Def. Ex. L at 3). Minter also reported that his memory following the crash "was patchy for approximately 2 weeks" and that he recalled suffering from headaches, photo sensitivity, and feeling easily overwhelmed following the crash. (Id.). Minter

---

in his environment and considers psychological, social, and occupational functioning on a continuum ranging from 0-100 according to the severity of the mental illness. Farrington v. Astrue, No. 3:09-CV-94-J-TEM, 2010 WL 1252684, at *11 n.9 (M.D. Fla. Mar. 29, 2010). An individual with a score ranging from 0-10 is deemed to be a persistent danger of hurting himself and cannot maintain standard self-care, while an individual with a score from 91-100 is deemed to be happy, healthy, and content. Riddles v. Astrue, No. 5:09cv388/RS/MD, 2010 WL 5071320, at *4 (N.D. Fla. Nov. 3, 2010), adopted by 2010 WL 5067972, at *1 (N.D. Fla. Dec. 7, 2010). "A GAF score of 41-50 describes serious symptoms and includes serious impairment in the social, occupational or school functioning." Farrington, 2010 WL 1252684, at *11 n.9 (citation and internal marks omitted).

reported to Dr. Mooney that there had been "about four events that he recalled from this period of amnesia, and [] that he [was] hopeful that other memories [would] return." (Id.).

Dr. Mooney noted that Minter told him that he "underwent a trial of 7 months of inpatient rehabilitation at the Shepherd Center where he received multidisciplinary treatment[.]" (Id.). Dr. Mooney also reported that Minter had returned to Fort McPherson for work, but that he just sat in an office "with a computer doing nothing," which Minter related to him being "flagged and under investigation by the government for conspiracy and possible theft of a large sum of money at some point before his motor-vehicle crash had occurred." (Id. (internal marks omitted)). Minter reported that he continued to suffer from chronic forgetfulness, but that he was basically a "'happy person,'" though his work situation was stressful. (Def. Ex. L at 4).

Dr. Mooney noted that Minter's prior CT study at the time of his accident was normal as was his head MRI, and he described Minter's prior concussion history as well as additional medical history. (Id.). Dr. Mooney discussed Dr. Macciocchi's evaluation and Minter's social and educational history. (De. Ex. L at 5). Dr. Mooney also noted that, with Minter's permission, he had contacted Minter's supervisor at Fort McPherson in order to interview him about Minter's functioning in the military

setting since returning from the Shepherd Center and that Minter's supervisor related that initially, Minter dressed as a civilian and did not know much about the military or his past, and that even after undergoing further training, Minter remained uncomfortable wearing his uniform and rank and that he did not believe Minter was deployable in his present condition.  (Id.).

Dr. Mooney administered Minter several tests, including the Animal Naming test, the Auditory Consonant Trigrams test, the Boston Naming test, the California Verbal Learning Test-II, Controlled Oral Word Association test, certain subtests of the Wechsler Memory Scale-III, the Medical Symptom Validity test, the Personality Assessment Inventory test, the Prospective Memory Tasks test, the Reliable Digit Span Procedure, the Rey Complex Figure test, subtests from the Wechsler Adult Intelligence Scale-III, the Test of Memory Malingering ("TOMM"), the Test of Motor Functions, the Trail Making tests, the Wisconsin Card Sorting test, and the word reading subtest from the Wide Range Achievement Test-IV ("WRAT-IV").  (Def. Ex. L at 5-6).  Dr. Mooney observed that Minter was alert; oriented to self, year, month, date, day of the week, and general location; participated in conversational speech; followed directions; and displayed good frustration tolerance during testing.  (Def. Ex. L at 6).

Dr. Mooney noted that Minter "demonstrated adequate approach and motivation across 8/8 indicators sensitive to effort during the psychometric cognitive portion of the evaluation," and that he adopted "a somewhat overly defensive stance when endorsing his emotional symptoms and personal short-comings[.]" (Def. Ex. L at 8). Dr. Mooney also noted that Minter's test results "were judged valid and interpretable, whereas his current emotional status may in fact under-represent his true level of emotional functioning." (Id.). On formal motor testing, Minter showed borderline deficient hand grip strength and he was "poorer with his left hand compared to his right on tasks requiring speeded manual dexterity and fine motor speed." (Id.). Cognitively, Minter performed within the low average or better ranges "across standardized measures of basic and complex attention, speeded information processing, expressive language skills . . ., visual perceptual skills . . ., ability to manually construct designs in a speeded fashion using blocks, and several aspects of executive functioning[.]" (Id.).

Dr. Mooney noted that Minter's memory performances were variable, that he demonstrated "average verbal learning and delayed remembrance for narrative type information that had been read to him," that he was able to "spontaneously engage in prospective remembrance," and that "his performances were confounded by an unusually high number of intrusion type errors," which indicated that while he was

48

"likely 'trying hard[,]' aspects of his performances were likely guesses."  (Def. Ex. L at 8-9).  Minter's "pattern of memory performances [] suggest[ed] . . . more of a rote (unaided) retrieval difficulty– at least on tasks that demand[ed] effortful high amnestic load functions such as when he [was] required to learn something new that he [was] unfamiliar with or [did not] have a simple theme or context."  (Def. Ex. L at 9).  Dr. Mooney identified Minter's capability to engage in verbal abstraction as an additional area of weakness.  (Id.).

In comparison to Dr. Macciocchi's May of 2009 evaluation, Dr. Mooney noted that Minter had "made additional recovery in his non-verbal intellectual functions, speed of information processing, [and] expressive language skills," but that he "continue[d] to demonstrate credible continued motor findings, a weakness in his high load/demand amnestic function of cryptic etiology (with visual worse than verbal), and a relative weakness in his verbal abstraction abilities."  (Id.).  Dr. Mooney also found that Minter had a "[c]ontinued penchant for presenting himself in an overly positive light[.]"  (Id.).  Dr. Mooney opined that Minter did not "show evidence today for malingered cognitive dysfunction of new learning and memory," and that the results indicated that "he may be one of the small minority of patients who continue[d] to display post-concussive symptoms well beyond the time frame

49

when most other persons typically recovered already." (Def. Ex. L at 10). Finally,

Dr. Mooney stated in relevant part:

> At this point, I think that it is important to state it may be possible to have a post-concussive type disorder (assuming nothing is brewing metabolically/hormonally) secondary to his MVA in May 2009 that could be co-morbid with a Conversion/Factitious/Somatoform type presentation relevant to his pre-injury autobiographical memory. That is, he may be in fact have bona fide sequelae from his "mild" TBI (resolving) superimposed on an overlapping Conversion, Factitious, or Somatoform disorder NOS. I don't think they have to be mutually exclusive.

(Id.). Based on his conclusions, Dr. Mooney offered the diagnoses of "[c]urrent

anterograde amnestic disorder of cryptic etiology – reflecting high load amnestic

functions," and "to [r]ule out possible conversion disorder vs. factitious disorder vs.

somatoform disorder NOS." (Id.).

Dr. Mooney recommended that, since no pertinent serum lab studies were

available, Minter undergo a "medical evaluation to determine if there are potential

metabolic or endocrine abnormalities complicating the clinical picture." (Id.). Dr.

Mooney also noted that he worried about Minter's fitness for duty from a cognitive

standpoint, but that the "brain does heal– and failure to observe improvement likely

implicate[d] non-concussion factors at play," noting that Minter had already passed

well beyond the three-month concussion window of when the "vast majority of

persons who have experienced a concussion typically have fully recovered." (Def. Ex. L at 9-10).

On December 10, 2009, Minter saw David Wilkie, M.D. ("Dr. Wilkie"), a neurologist at the Dwight D. Eisenhower Army Medical Center, for his memory loss. (Gov. Ex. 8A; Def. Ex. M). Dr. Wilkie noted that Minter could not recall about a 20-year period, but that he had "relearned much of what had transpired, including his military career, family life ETC" and "[did] not have much troub[le] forming new memories," describing that at times he had become "confused [about whether] he [remembered] this [from] when it happened vs just remembering what he ha[d] recently learned." (Gov. Ex. 8; Def. Ex. M at 2).[38]

Based on his examination of Minter, Dr. Wilkie found that Minter had an "[a]typical pattern of retrograde amnesia, onset after what fits the definition of mild traumatic brain injury, though mechanism of injury could have certainly produced worse than mild brain injury." (Def. Ex. M at 3). In particular, Dr. Wilkie noted that Minter's "retrograde amnesia [was] not typical of organic brain injury, and [he could not] believe that he could voluntarily fake what he display[ed] clinically," and that the "most likely explanation for his retrograde amnesia [was] subconsciously

---

[38] Dr. Wilkie noted that Minter had been "told there has been an investigation about potentially 3 million dollars missing [from] 2006 and he could be involved, but he recalls nothing about this." (Def. Ex. M at 2).

51

produced symptoms typical of conversion," which would "imply significant psychological trauma, presumably from some time in his period of amnesia, considering lack of reported substrate for the time he [could] remember."  (Id.).  Dr. Wilkie further noted that Minter did not "have other symptoms or sequellae [sic] of traumatic brain injury which affect[ed] his daily life or ability to function in the military," that his conditions were "static from the standpoint of current cognitive functioning, though [his] inability to recall his entire milit[a]ry train[ing] certainly interfer[ed] with his ability to perform military duties," and that since it was unlikely that his memories were "'lost,' but rather they [were] 'stored in his head, just currently not accessible [sic]', his ability to perform duties could certainly improve in the future."  (Id.).  Finally, Dr. Wilkie noted that "[w]hen and whether his 'lost memories' [would] return [was] uncertain, and there [was] no realistic expectation it [would] be soon," and that "[a]t this point[,] his ongoing cognitive impairment [was] enough to fail retention standards . . . , and medical board [was] appropriate."  (Id.).[39]

On May 11, 2010, Minter underwent further psychological testing with Ken Dobbins, Ph.D. ("Dr. Dobbins"), a psychologist with Dwight D. Eisenhower Army Medical Center, based on a referral from the Medical Evaluation Board Office.  (Gov.

---

[39] In January of 2010, Minter had another MRI of his brain, which revealed that there was no acute intracranial pathology.  (Def. Ex. N).

Exs. 8 & 8A; Def. Ex. O).  After reviewing Minter's medical records and conducting a clinical interview of Minter,[40] Dr. Dobbins administered several standard psychological tests and observed that "Minter put forth an excellent effort on all measures of cognitive functioning."  (Def. Ex. O at 3-4).  Dr. Dobbins also observed that "[p]sychological testing was somewhat more ambiguous in that he approached the testing in an overly defensive fashion" and that "[d]espite his guarded and self-favorable presentation, his testing was valid and could be interpreted."  (Def. Ex. O at 4).

Dr. Dobbins observed that Minter "displayed fluent, articulate speech with no evidence of aphasia or of a decline in functioning" and "high average to average performances on measures of attention, concentration, and information processing speed," but that he "continue[d] to display lower than expected visual spatial skills." (Id.).  With regard to Minter's memory, Dr. Dobbins noted that he "continue[d] to display intact and average memory functioning" and that there were "no indications of an impaired ability to attend, concentrate, and recall newly learned information." (Def. Ex. O at 5).  Minter displayed a "variable performance on measures of motor functioning and sequencing speed," and Dr. Dobbins noted that some of the

_____

[40] Dr. Dobbins noted that Minter reported he had been "'flagged' . . . due to an investigation of a missing 2.8 million dollars from 2006 while he was assigned to Saudi Arabia" and that he was "first informed of this investigation in July 09[.]" (Def. Ex. O at 2).

findings were "somewhat inconsistent and difficult to understand given the nature of his injury." (Id.).

Testing revealed that Minter was functioning within the average range of intelligence; that his profile was self-favorable, presenting himself in an overly positive light, and suggesting some deficiency in judgment and lack of insight into his own behavior; and that he fell within the minimal range for depression. (Id.). Dr. Dobbins concluded that Minter's psychological testing "was valid but guarded and may not fully characterize his mood or personality due to his efforts to present himself in an overly positive light." (Id.). He also concluded that Minter's "retrograde amnesia of almost two years [was] most likely due to psychogenic causes and inconsistent with the symptoms and recovery course from a mild concussion." (Id.). Based on these findings, Dr. Dobbins opined that Minter did not "demonstrate convincing evidence of a disqualifying cognitive deficit" and that "[e]xcept for his retrograde amnesia, he could normally return to duty," but that "with a dense two year retrograde amnesia which remain[ed] unresolved after one year of treatment, [Minter did] not meet retention standards and [it was recommended] that [Minter] proceed in medical board channels for the purposes of retirement." (Def. Ex. O at 6). Dr. Dobbins deferred treatment recommendations to Minter's current providers and noted that "it would be expected that his amnesia

would likely improve with time and after his legal problems have been resolved."

(Id.).

A couple of days later, on May 13, 2010, Semhal Abbay, M.D. ("Dr. Abbay"), a psychiatrist at the Dwight D. Eisenhower Army Medical Center, evaluated Minter. (Gov. Exs. 8 & 8A; Def. Ex. P).   Based on her examination of Minter, Dr. Abbay opined in relevant part:

> No objective sign of amnesia.  Neuropsych testing (MMPI) suggestive of answering questions dishonestly.  Meets retention standards based on there being no identifiable Axis I disorder.  There was no sign on PAI/MMPI or on clinical interview of somatoform disorders.  Current investigation while he was a chief financial officer in Saudi Arabia put to question whether there [was] alternative motive to current symptoms. May need to consider separation/retirement through other channels.

(Def. Ex. P at 4).

On February 15, 2011, Christopher E. Hines, M.D. ("Dr. Hines"), a psychiatrist with the Army's Psychiatric Medical Evaluation Board, examined Minter, and his diagnostic impressions were Axis I: conversion disorder as manifested by dense amnesia for events covering the period of twenty years; Axis II: deferred; Axis III: cluster headache, traumatic brain injury, and shoulder and ankle injury; Axis IV: Axis I, partner relational problem, and occupational problem; and Axis V: a GAF

scale score of 63.[41]  (Gov. Ex. 9; Def. Ex. Q at 3).  Dr. Hines found that Minter was

competent to handle all financial affairs and to participate in the Medical Board

proceedings.  (Def. Ex. Q at 3).  Based on his evaluation, Dr. Hines opined that

Minter "fail[ed] to meet retention requirements," and he recommended that Minter

be referred to the Physical Evaluation Board for further adjudication.  (Def. Ex. Q at

4).

On March 21, 2011, Eric Doane, D.O. ("Dr. Doane"), the Chief of the Army's

Medical Evaluation Board, reviewed Minter's case and diagnosed him with

conversion disorder.  (Gov. Ex. 9; Def. Ex. R).  Dr. Doane noted that there was "no

objective data to support any of [] Minter's claims of amnesia; however, he [was]

adamant that he [was] dysfunctional and unable to perform," and that he had been

awarded full disability from Social Security.  (Gov. Ex. 9A; Def. Ex. R at 3).  Dr.

Doane recommended that Minter be presented to the Physical Evaluation Board for

a determination of fitness for duty.  (Def. Ex. R at 3).[42]

---

[41] "A GAF score of 61-70 indicates 'some mild symptoms,' but generally functioning 'pretty well [and] has some meaningful interpersonal relationships.'" Ramer v. Astrue, No. 3:08–cv–484–J–TEM, 2009 WL 2905904, at *6 (M.D. Fla. Sept. 8, 2009) (alteration in original) (citation omitted).

[42] In May of 2011, the Secretary of the Army approved Minter's permanent disability retirement, and he received a rating of 50 percent based on the diagnosis of dissociative amnesia.  (Def. Exs S & T).

On June 19, 2012, Gary Kittrell, Ph.D. ("Dr. Kittrell"), a psychologist, evaluated Minter at his request, and administered him several standard tests, including the WAIS-IV, the Bender Visual Gestalt test, the Elizer Test of Psychoorganisity, and the WRAT-IV. (Def. Ex. U). Upon mental examination, Dr. Kittrell observed that Minter presented himself as a mildly anxious and agitated and moderately restless individual. (Def. Ex. U at 4). He noted that he put forth an adequate effort on most assigned tasks with below average frustration tolerance. (Id.). He also noted that Minter's remote memory for specific basic personal information was adequate and that he had no difficulty remembering events of the day prior. (Def. Ex. U at 5). Dr. Kittrell found that Minter's performance on the WAIS-IV was not consistent with his educational level and job history and "may indicate a post morbid decline." (Def. Ex. U at 6). He also found that Minter's testing results "appeared consistent with low average intellectual status, cognitive disordered dynamics with executive skills deficits, below average basic academic skills and reported restrictive daily activities." (Def. Ex. U at 7).

Dr. Kittrell's diagnostic impressions were Axis I: cognitive disorder, not otherwise specified, and attention deficit hyperactive disorder, not otherwise specified; Axis II: personality disorder, not otherwise specified, with mixed features; Axis III: deferred; Axis IV: psychosocial and environmental problems as well as

economic issues; and Axis V: a GAF scale score of 50. (Def. Ex. U at 7-8). He opined that findings suggested a "pattern of low average intellectual status, cognitive disordered dynamics with executive skill deficits, below average basic academic skills, and reported restrictive activities of daily living." (Def. Ex. U at 8).

### 2.   Government's Witnesses at the Competency Hearing

#### a.   Agent Cole

The government first presented Agent Cole's testimony at the competency hearing. [Doc. 82 at 9-19]. Agent Cole testified that she was a Special Agent in the Office of Special Investigations with the United States Air Force, and that in October of 2009, she was asked to participate in the ongoing investigation of Minter. [Id. at 10]. In particular, Agent Cole stated that she was asked to call Minter in response to an ad he had placed in an attempt to sell his boat.[43] [Id. at 10-11]; see also (Gov. Ex. 3). On October 15, 2009, Agent Cole contacted Minter, and the call was recorded and subsequently transcribed. [Doc. 82 at 11-13]; see also (Gov. Exs. 1 & 2).

During the call, Agent Cole asked Minter specific details about the boat, which Minter provided, including that the boat had "ninety hours on it," that he had it since 2006, that he had it in the water three times this year, the location of the boat

---

[43] Agent Cole testified that she was asked to place this call in order to get Minter to discuss certain details about the boat and his past in an attempt to determine whether Minter was feigning his retrograde amnesia. [Doc. 82 at 13-14].

at Lake West Point, and that he had only had the boat in fresh water such as Lake Murray in South Carolina where he used to live.  (Gov. Ex. 2).[44]  Agent Cole then told Minter that she was in the military and asked if Minter would give her a military discount.  (Id.).  Minter replied, "Um, well believe it or not, I'm actually a Major in the Army.  I've been active duty for over nineteen and a half years."  (Id.). Minter then indicated he would offer Agent Cole a discount and asked, "What's a good uh . . . you know . . . ten percent? That'd be three grand, twenty-seven thousand? . . . I mean, that's uh . . . that's pretty much what people say, take ten percent?"  (Id.); see also [Doc. 82 at 16-17].  Agent Cole also asked Minter why he decided to join the Army instead of the Air Force, and Minter replied, "Um . . . I, uh . . . I'll be honest with you, I have no idea.  Uh, I don't know.  Just, yeah.  Guess I wanted to go and do, uh, stupid things, you know, end up going jumping out of airplanes, going to Ranger school, all these you know, cool things that . . . sure I

---

[44] On cross-examination, Agent Cole admitted that many of the details regarding the boat, including the manufacturer, the make and model, the hours on the boat, and the type of engine were all provided in the ad listing the boat for sale. [Doc. 82 at 14-16]; see also (Gov. Ex. 3).  However, at the time of the conversation, Minter was driving and indicated that he was not looking at the ad while speaking with Agent Cole.  [Doc. 82 at 19].

could've done all that in the Air Force as well.  But I don't know.  Stupid . . . how

'bout that one?"  (Gov. Ex. 2 (alterations in original)); see also [Doc. 82 at 17-18].[45]

### b.    Dr. Dorney

Dr. Dorney, a psychiatrist with Peachtree Psychiatric Professionals, P.C.,

testified as the government's first expert witness.  [Doc. 82 at 20-152].  Dr. Dorney

testified that her evaluation consisted of reviewing Minter's medical records,

conducting a three-hour interview of Minter, meeting with Minter's wife for about

thirty minutes, and consulting with Dr. Flores and reviewing the psychological

testing performed by Dr. Flores.  [Id. at 31-33, 36, 45, 128].  Dr. Dorney explained that

Minter was able to tell her who his lawyer was and that he was able to work with

him and that he did not display any paranoia with regard to his attorney.  [Id. at

34].[46]  Dr. Dorney also observed that Minter had "very good verbal skills," that he

was "clear and organized in his thinking," and that in her opinion, he had the

---

[45] Agent Cole and Minter also had a discussion about which ad Agent Cole
was looking at for the boat and once she relayed the ad she was looking at, Minter
stated, "Oh, I have no idea where that one even . . . uh . . . Hmm.  What is the, what's
the asking price on that one?"  (Gov. Ex. 2); see also [Doc. 82 at 18].  On cross-
examination, Agent Cole testified that the ad she was looking at appeared to have
been posted on March 15, 2008, over a year prior to Minter's accident.  [Doc. 82 at
18].

[46] Minter concedes that he is aware of the charges against him and different
possible pleas as well as the participants in a trial.  However, he asserts that the
main issue is his inability to assist his attorney.  [Doc. 82 at 34].

"ability to learn new information that could be taught to him about his case."  [Id. at 34-35].  Basically, Dr. Dorney "did not see anything that would actually interfere with [Minter's] ability to assist counsel."  [Id. at 35].

With regard to Minter's memory loss for the period from 1989 to 2009, Dr. Dorney testified:

> So the next issue was, if he has a 20 year gap in his memory, how would that affect his ability to assist counsel?  And in many cases when you are assessing competency to stand trial, it really doesn't interfere because there is collateral information that the defendant can be taught.  There are witnesses that – who that can get witnesses reports.  In his case it actually could interfere because if there is no collateral to support it, then that is a big piece of information missing.  So that was some concern.
>
> So, then at that point I had to really look at is this retrograde amnesia real?  Is it something that is likely to be or is it something that is actually exaggerated or made up in order to have secondary gain?  And even though psychological testing is very helpful when it comes to current issues or other memory problems with new information, there is no identifiable test that will actually target that retrograde amnesia for 20 years.  So what you have to do is really rely on collateral information that we have and also inconsistencies.  And then most importantly the medical information which is what we know a lot about because we have neurological reports that basically – I could get into those in detail that do not support retrograde amnesia as being something that [] Minter has.

[Id. at 35-36].  Specifically, Dr. Dorney testified that she concluded Minter "was not suffering from retrograde amnesia and that he was competent to stand trial" and that he was also "not suffering from conversion disorder or any type of psychogenic

61

or dissociative amnesia that could affect his ability to assist counsel." [Id. at 36]; see also [id. at 46 ("It was my opinion [Minter] was competent to stand trial and that he was not suffering from retrograde amnesia, it was malingered amnesia. I did not believe it was any type of psychiatric disorder such as conversion disorder or dissociative amnesia."), 141 (responding, "I am confident in that" to the question, "And you are asking [J]udge [V]ineyard to believe that even though repeated doctors have diagnosed [] Minter with conversion disorder and no other doctors besides yourself and Dr. Flores say he is malingering, when the Army, VA, social security they are all giving him money, you are able to tell [J]udge [V]ineyard, with a reasonable medical degree of certainty, that he is malingering, are you confident in that?")].[47]

---

[47] In this regard, Dr. Dorney explained that she first looked at retrograde amnesia which she ruled out through the medical doctors as not making sense or being inconsistent with Minter's injuries, but that some of those doctors labeled him with conversion disorder, psychogenic amnesia, or disassociated amnesia which she also found did not fit the circumstances. [Doc. 82 at 37]. In particular, Dr. Dorney discussed Minter's medical records from AMC and the Shepherd Center and noted Drs. Kaelin and Macciocchi's opinions that Minter's retrograde amnesia was "unusual" and difficult to explain based on his mild traumatic brain injury. See [id. at 37-40, 48-49, 52-67, 148]; see also [id. at 43 ("[U]sually if there is a severe traumatic brain injury where memory can be affected, most even with acute insult . . . where that is injured it is visible on a scan . . . . There was no evidence of that. And even in those cases it resolves over time. Normal course is three to six months, you can have improvement the first two years . . . . But practically all cases resolve with retrograde amnesia."), 120-21, 149-51 (discussing Dr. Abbay's opinion that Minter does not suffer from a disorder and that testing indicated dishonesty), 132-33 ("[R]etrograde amnesia typically resolves.")]. She then discussed the various

### c.    Dr. Flores

Dr. Flores, a licensed psychologist, testified as the second expert witness for the government.  [Id. at 152-241].  Dr. Flores testified that Dr. Dorney consulted with her and asked her to assess Minter's psychological functioning based on an "indication of some possible memory deficits" and "to evaluate memory because [Dr. Dorney] was going to conduct the competency evaluation, [and] wanted to know if there were any current issues that might affect competency to stand trial." [Id. at 159-60, 200].

---

medical records discussing possible conversion disorder, explaining that this disorder manifests in transient symptoms typically based on a psychological trauma, and noted that Minter had no history of psychological trauma, and that even if there were, it would be considered dissociative amnesia, which "would have happened at some point in the past and the amnesia would be about that emotional trauma [(i.e., anterograde amnesia)]," not "about a 20 year span of that life in general."  [Id. at 40-44, 64, 144-46]; see also [id. at 72, 101-06, 115-19, 123-25, 133-36 (testifying that "[c]onversion disorder does not cause retrograde amnesia. . . . Even if that diagnosis were correct, there is no issue related to competency to stand trial," and responding affirmatively to the question of whether "All of these doctors . . . that diagnosed him with conversion disorder are wrong?")].  She also stated that there were no symptoms of a somatoform disorder.  [Id. at 45].  Dr. Dorney then stated, "What we are left with is malingered amnesia or Factitious disorder, which is actually conscious intentional production of symptoms to be a patient," which she also felt was not related to Minter's situation because she "wasn't seeing anything that he enjoyed being in the sick role."  [Id.]; see also [id. at 37, 41].  Dr. Dorney also testified that she did not include any discussion regarding Dr. Sussman's conversations with Minter's counselor at the Shepherd Center and co-workers, all of whom did not believe Minter was feigning memory loss, in her report because those individuals were not doctors.  [Id. at 78-82].

As part of her evaluation, Dr. Flores reviewed Minter's medical records,[48] conducted an in-person interview of Minter, and administered Minter several standard psychological tests.  [Id. at 161-62]; (Gov. Ex. 11).  Specifically, Dr. Flores testified that she administered Minter the Minnesota Multiphasic Personality Inventory-2 test, which she explained involved two scales: one that provides insight as to self-reported symptoms of the individual, and the other that "give[s] impressions in terms of whether the responses that the respondent gave . . . [were] in fact valid[.]"  [Id. at 161-62]; (Gov. Ex. 11).  Minter's results indicated that he responded "in an honest way" and all of his "clinical scales were . . . within [] normal limits," meaning "there was no indication of any current psychiatric disturbance."  [Id. at 162-63]; see also [id. at 210-12].  Dr. Flores testified that Minter's IQ score fell within the average range,[49] and that his visual and auditory memory functioning also fell within the average range.  [Id. at 163-64]  With regard to the TOMM, Dr. Flores stated that Minter's results indicated that he was not malingering any current memory deficits, but that there were "no tests to assess for long-term

---

[48] Although Dr. Flores' report states that she only reviewed Minter's records from the Shepherd Center, see (Gov. Ex. 11), she testified that she in fact reviewed all of his medical records but did not have all of them in front of her when she wrote the report, see [Doc. 82 at 160-61, 202-04].

[49] Dr. Flores testified that she would have expected Minter's IQ score to be higher than average and that she suspected that the score was an underestimate of his abilities.  See [Doc. 82 at 217-19].

memory deficits." [Id. at 164-65, 206-07, 234]; see also [id. at 167 ("[T]here is no way to test for faking of past memory deficits.")].

Based on her evaluation and objective testing of Minter as well as collateral information, Dr. Flores observed that Minter gave adequate effort and was cooperative, but concluded that everything "was [] consistent with the diagnosis of malingering with the amnesia he was reporting." [Id. at 165-66, 209-10, 233, 236-37, 240]; see also [id. at 170-71]; (Gov. Ex. 12).[50]  Dr. Flores explained that "retrograde amnesia would be associated with brain injury and that ha[d] been ruled out,"[51] so "basically what the medical professionals and psychologists have said [was] this is not retrograde amnesia so it must be something else, it must be some sort of

---

[50] Dr. Flores explained that she evaluated Minter for eight hours, and that the "information [] he was providing with regard to the long-term data that he alleged to have lost was very fluid" and that he "would explain it away by saying . . . [his] wife told [him]," but he was able to "consistently answer questions . . . in ways that you would expect somebody to answer who actually had the memory and just retrieved it, not who had been fed a lot of information because the information that I was asking for was lots of different kinds of information." [Id. at 166-67]; see also [id. at 169-70, 208-09 ("[H]e was able to answer fairly consistently every question that I was able to ask he had an answer. . . . It would have been a lot of learning to do in three years.")].  She also noted that Minter's self-reported symptoms were inconsistent with retrograde amnesia.  See [id. at 184-85, 187-91, 220-21, 235-36].

[51] Dr. Flores referenced a study on retrograde amnesia, which showed that out of 973 patients, 80 percent of these patients' symptoms resolved after about 30 minutes, that 2 patients had retrograde amnesia for 3 months, and that one patient had amnesia for one year.  [Doc. 82 at 175-76, 178, 196-97]; see also [Doc. 80-3 (excerpt of study referenced by Dr. Flores and introduced by Minter in his motion to supplement the record)].

psychological process," but when she considered the psychological processes, including conversion disorder,[52] dissociative amnesia, factitious disorder, and somatoform disorder, she was able to rule those out as well. [Id. at 167-70]; see also [id. at 173-84, 198-200]. Dr. Flores also concluded that Minter had good verbal skills and that he possessed memory abilities to learn and retain information. [Id. at 192]; (Gov. Ex. 11).

### 3.  *Minter's Witnesses at the Competency Hearing*

#### a.  **Friends and Family Members**

Minter first offered the testimony of Gina McCabe ("McCabe"), a friend Minter met through his wife in late April or early May of 2009. [Doc. 83 at 14-15, 18].[53] McCabe described Minter as "extremely friendly, a very hands-on dad," but testified that after the car accident, he had to be introduced to her, was a "bit uncomfortable," and that he said to her, "I am not sure if I knew you before the

---

[52] Dr. Flores testified that at the time of her evaluation of Minter, she utilized the DSM-IV and that under that version, Minter did not meet the criteria for conversion disorder since there was an absence of symptoms or deficits affecting voluntary motor or sensory function. See [Doc. 82 at 184, 221-23, 225-26, 230-31, 233]. Minter, however, points out that the DSM-V was published in May of 2013 and that it modified the definition of conversion disorder by noting that it could be associated with dissociative symptoms such as dissociative amnesia. [Id. at 224]; see also [Doc. 91 at 21; Doc. 80-2 at 13].

[53] McCabe testified that the first time she met Minter, she spoke to him for about 25 minutes and that the next time she saw him was "probably after his accident." [Doc. 83 at 19-20].

accident, Tiffany tells me that I did, so it is nice to know you again[.]"[54]  [Id. at 15-17]; see also [id. at 20-21].  McCabe stated that she saw Minter "very often" immediately after the accident, but that she only saw him once or twice a year at the time of the hearing.  [Id. at 17].

Minter next offered the testimony of Dana Adams ("Adams"), another friend of Minter's wife whom he met sometime in 2008.  [Id. at 24-25, 29].  Adams testified that she would see Minter during soccer practice and at games for their children, but that he would assist the soccer coach "so there wasn't a whole lot of interaction." [Id. at 25].  Adams stated that after the car accident, Minter was "[a] little more withdrawn . . . less sure of himself" and that he was "[u]nsure of things to say if people would ask him questions, he was kind of hesitant, unsure, uncomfortable." [Id. at 26]; see also [id. at 33].  She testified that he told her to forgive him, that he was "trying to remember" and "trying to recover"  [Id. at 27].

Adams recalled specific incidents when Minter had trouble with his memory and explained that prior to the accident, Minter was "always very up on trivia and news and things like that" and that he "always had the latest and greatest

---

[54] McCabe described an incident where she was walking through Minter's house with Minter after the accident and noticed all of his military decorations on the wall and he said, "Yeah, I wish I remembered, I wish I remembered those things."  [Doc. 83 at 17-18, 21].  She also stated that she has had conversations with Minter about the fact that he did not remember his wedding or the birth of his children.  [Id. at 22].

technology," but that afterwards, "he didn't know how to use his phone. . . . and couldn't believe that Arnold Schwarzenegger was actually in politics and not just an actor[.]"  [Id.].  She also stated that he did not know about "9-11, which he did before."  [Id.].  She further recalled that Minter had difficulty remembering people at church and described that he would carry a notebook with him to write things down to try to help "jog his memory."  [Id. at 28-29].  Finally, Adams testified that during her interactions with Minter after the accident, she did not receive any indications that he was faking his memory loss.  [Id. at 34].

Michael Panasko ("Panasko"), Minter's brother-in-law, who has known Minter for at least 18 years, was the third witness to testify on Minter's behalf.  [Id. at 35-36].   Panasko testified that prior to the accident, he and Minter were guaranteed to see each other at least once a year for a golf outing over Memorial Day weekend with other friends and that they would also see each other over the holidays and talk on the phone and e-mail each other throughout the year.  [Id. at 36-37, 41-42].  Panasko described that when he first met Minter, they "kind of clicked," [id. at 37], but that after the accident, "it [was] different," [id. at 38].[55]  In particular, Panasko described that because of Minter's memory deficits, it was like

---

[55] Panasko also described the first time he saw Minter following the accident and said that it was "kind of an awkward moment for [him]" and that Minter "was a little bit isolated."  [Doc. 83 at 43-44].

"talking to someone new" because there was "just a blank" and that he "lost the part where [he] had all of those experiences [with Minter] and [he] could kid around, [he] could joke around, [he] could make the inside jokes and [he] knew exactly what was happening, but [he didn't] have that any more."   [Id. at 39-40].[56]  When asked whether there was anything that would indicate Minter was faking his injuries, Panasko responded in relevant part as follows:

> No, but I don't know what you would look for.  To me it was mannerisms or things that after years and years of knowing someone that you expect them to say or do, it doesn't come up.  There are certain things where it is kind of a blank board where you don't have that reference point and when you are talking with someone and they don't have it, you start to realize that, you know, something happened. Whatever it was, something happened on the ninth, and I don't know that that is something that is fixable or what, you learn that that is not coming back.

[Id. at 40-41].

Minter's wife, Tiffany Minter ("Mrs. Minter"), testified at the hearing and stated that she has been married to Minter since 1995 and that they met in 1993 while they were both in the Army.  [Id. at 47].  Mrs. Minter described Minter's personality prior to the accident as "very motivated, energetic, [and] outgoing," but that since the accident, he was more "like a child[.]"  [Id. at 51].  She described the day of the accident and stated that when she arrived at the hospital after being

---

[56] Panasko testified that Minter had attended some of the golf outings since the accident and that he still saw him on holidays.  [Doc. 83 at 44-45].

informed that Minter was in an accident, the nurse met her at the door and told her that she should not be "shocked but he was having some memory problems and he may not know [her]."  [Id. at 52-53].  She testified that she disregarded what the nurse said and entered the room and that Minter "looked right past [her] and [she] realized that he didn't know [her]."  [Id. at 53].  When asked whether Minter remembered her after some time, Mrs. Minter answered, "I think he wanted to spare my feelings because I overheard him tell his mother that I was a nice lady.  She seems like a nice lady.  That was hard to hear.  He said she treats me very nice, she is a nice lady, his mother said she is your wife."  [Id. at 54].[57]

Mrs. Minter testified that when Minter returned home after being released from the hospital, that he was still suffering from headaches and noise sensitivity. [Id. at 55].  She said that those first few weeks back from the hospital, she "tried not to take  anything personally" and that she "tried very hard to allow [Minter] to try to do things on his own," but that there "were a lot of mistakes" and that there

---

[57] Mrs. Minter testified that she took a photo album to show Minter, but that "the more pictures he looked at the more questions he had and . . . it was bringing a lot of stress on him because he would wonder with every picture where was that taken, what year was that, who was in the picture, where did [she] get that red shirt. It was one question led to a million questions."  [Doc. 83 at 55].  She also stated that Minter started keeping a notebook and "wrote every single thought that came into his mind" in it until the doctors told him to stop doing that or he was going to "make himself crazy."  [Id.].  She further testified that he asked a lot of questions about their children, including when they were born, what they liked to eat, whether they played sports, and was he a good father.  [Id.].

continued to be mistakes.   [Id. at 56-57].   She testified regarding Minter's forgetfulness, including that he had paid the car payment twice in one month and had not paid it at all one month because he thought he had paid it already and that he had left the water running and flood their house.  [Id. at 57].  She also testified that he did not remember how he proposed marriage to her, [id. at 58, 63], and that communication was difficult and that he would say inappropriate things but not understand why they were inappropriate, [id. at 58-59].  When asked how Minter's personality had changed since the accident, Mrs. Minter testified:

> He is not as outgoing, He is very – I just feel like he doesn't put himself out there anymore.  You couldn't keep him in the house before the accident, he could not stand to be sitting, he had to be doing something. I always said he had nervous energy and I wanted to bottle it up because I could have used it.  And now he is lethargic, he is very unmotivated to do anything, and I feel just keeping him with little tasks because I am not at the house, [I] go to school full-time, so I feel that if he can just do little tasks throughout the day it keeps him occupied. And so that is where the notes come in, honey, do this, do this, do this. And we recently got chickens and I feel like that has been wonderful to him, it gives him a sense of purpose.

[Id. at 61-62].

### b.   Dr. Powell

Minter called Dr. Powell, a licensed psychologist in private practice, to testify on his behalf as an expert witness.  [Id. at 113-14].[58]  Dr. Powell testified that he did

---

[58] Dr. Powell testified that he attended Duke University and graduated with a degree in pastoral psychology.  [Doc. 83 at 114].  He stated that he then attended

not evaluate Minter or perform any psychological testing on him, but that he had

spoken to him in casual conversations.  [Id. at 115, 132-33].  Dr. Powell also testified

that he "reviewed most of the [medical] reports" in this case, but that he "did not

review the military investigation" because he had not "been with this case very long,

it is a huge stack."  [Id. at 133, 194-95].[59]

_____

North Carolina State and obtained his doctorate in clinical-community psychology.
[Id.].  He stated that he had taken courses in graduate school in learning and
memory, that he had worked with patients with memory deficits and conversion
disorder, and that he had held various faculty positions.  [Id. at 115-17, 131-32].  He
also explained that he had performed guardianship work on behalf of the probate
court in Clayton County, which specifically dealt with elderly individuals dealing
with Alzheimer's or dementia.  [Id. at 117, 128-29].  He stated that he had also
worked with sexually abused patients, including some who had memory issues
surrounding the traumatic event.  [Id. at 118, 126, 129-30].  He testified that he has
written on post-traumatic stress disorder and its effects, including memory issues,
but that he had not written any papers on retrograde amnesia, conversion disorder,
or dissociative disorder.  [Id. at 118-19, 130].  Dr. Powell testified that he had been
designated an expert witness more than 200 times in state and federal court, that he
has been "qualified as an expert regarding the administering and scoring and/or
evaluating of psychological tests," and that he has testified as an expert in
competency hearings on 10 to 12 occasions.  [Id. at 119-20, 130-32].

    [59] In fact, the government points out that Dr. Powell was retained only 10 days
prior to the competency hearing and that it received his report the night before the
hearing, see [Doc. 83 at 125, 133]; see also [id. at 136-37], and Dr. Powell stated that
his understanding was that he would only be testifying as to things contained
within his report but that he was just advised the day prior about other issues his
testimony would be related to, including testifying about Drs. Dorney and Flores'
opinions, [id. at 133-34], which the government objected to as improper, [id. at 134].
Based on the arguments from counsel, the Court limited Dr. Powell's testimony,
stating as follows:

         I think the bigger issue is [Dr. Powell's] testimony about Dr.
    Dorney and Dr. Flores, which the government doesn't have any

Dr. Powell testified about the MMPI test and stated that there was nothing in Dr. Dobbins' report that would suggest Minter was lying on any of his test activity. [Id. at 154]; see also [id. at 155-57].  Dr. Powell testified that it was "possible for someone to learn his past issues in his life, past things in his life and create an awareness of information and just start creating a new memory[.]"  [Id. at 158-59]; see also [id. at 160 ("With most people with retrograde amnesia you should be able to learn, reestablish a life, and some people that is all they do is create a new life. . . . You create new memories."), 187-88].  He also testified that there was no objective test that could be performed that would measure whether or not someone has amnesia or was malingering retrograde amnesia.  [Id. at 162, 186-87].

---

summary of what he is going to say.  I don't think it is fair to the government to put them in that situation given the untimeliness.  I am also not convinced it would be a proper subject for testimony the way it was described to me.  I will say that you have tendered him as an expert and Dr. Powell appears to me to be qualified as an expert in the field of psychology and specifically he has testified 10 to 12 times on competency issues and psychological testing.

     I would allow Dr. Powell to testify to the contents of the summary, this November 13, 2013 on those topics which pertain I believe to Dr. Dobbins.

[Id. at 137-38].  In particular, the Court found that Dr. Powell was not "qualified to offer the opinion . . . about Dr. Dorney, who is a psychiatrist."  [Id. at 145]. As for Dr. Flores, the Court found that Dr. Powell could "talk about the testing that he describe[d] in his report" and that he was "qualified to testify about psychological testing in general, but not to critique Dr. Flores' decision."  [Id. at 149]; see also [id. at 150-51].

With regard to the collateral information relied upon by Dr. Flores in reaching her opinion, Dr. Powell testified:

> The impressive part of the collateral is all of these doctors who keep coming to the same conclusion that the memory is not the usual way people deal with amnesia.  And I think that is true.  And that kind of collateral information is important.  The missing part of that collateral information was looking at what about if it is unusual, what about the people who are like that?  Are there other people that have that unusual pattern?  And what we find from the scientific literature is that between 10 to 15 percent of all retrograde amnesia patients have the same pattern that [] Minter has of this continuing long-term multi-year amnesia.  And that is in the medical literature.  But the majority of people clear.  And the majority of people I have worked with have cleared, but some, not just – I have been working with [] Minter, but people like him with closed-head injuries, sometimes have amnestic events that occur for several years.  One that I just recently talked to had [] ten years to get totally clear and memory back.  So, that is consistent with the literature that exists in the minimal traumatic brain injury data that is ten to fifteen percent have this pattern, that it continues on, and it is very difficult and they have a really, really difficult struggle.

[Id. at 162-63]; see also [id. at 163 ("It is a small minority.")].  Dr. Powell further explained in relevant part:

> You know, the average person gets over the flu in let's say, four days, but some people take seven days.  Does that mean they are malingering their flu?  No.  It just means respond [sic] in idiopathic ways, that we have individuals and people heal the best way they can.  And within the scope in scientific literature of traumatic brain injury, we have this pattern of continuing, it is not the common pattern, it is the uncommon pattern, it is the minority, but it is the important minority.  The people I see have traumatic brain injury, they don't come to me because of that traumatic brain injury, they go to the neurologist to be healed.  They

come to me, they have lasting effects, they are not being healed, have
to deal with anxiety, depression, being out of work, living on disability.

[Id. at 164].[60]

With regard to conversion disorder, Dr. Powell testified that it was a
"symptom that might be explained by medicine, but it [was] not explained by
medicine. Instead it [was] explained by a psychological conflict that can come out
in a variety of ways," such as motor or sensory function or it could "suggest a
neurological as well as a general medical condition." [Id. at 175]. He stated that "by
convention," conversion disorder was often thought of as the "hysterical blindness
or the woman who was ready to hit her husband and her arm locked," but that there
was also "a much smaller tradition in conversion disorder of dealing with more
cognitive processes" and that the "new DSM-V . . . include[d] a wider range of
things, and focus[ed] more on cognitive disorder and less necessity of proving at this
point physical disorder." [Id. at 176]. In particular, Dr. Powell testified that he did
not "think the[] doctors were all ready to be sued for malpractice . . . or totally
incompetent because they said conversion disorder," but that what they were saying
was that "an underlying psychological pattern [] may be explaining this" and "[i]t

---

[60] Dr. Powell also testified that lowered IQ scores were "very common" with
traumatic brain injuries and that when an individual has a "lowered IQ it is a [b]ad
prognostic sign and may indicate the symptoms will not resolve as quickly." [Doc.
83 at 170].

could be that this is one of the ten to fifteen percent of traumatic brain injuries that are going to be prolonged or it could be that [] those are physical, and there may also be or instead be a psychological factor that [was] causing the failure to remember and you can use the term conversion disorder for that and still be within a certain tradition within the diagnostic field."  [Id. at 177].[61]

   **c.**  **Minter's Testimony**

   Minter also testified at the competency hearing.  Minter described his typical day as being a "stay-at-home dad," and stated that he normally spent the day doing laundry, cleaning the chicken coop, reading, preparing dinner, and trying to do homework with the children.  [Id. at 76].  Minter described his previous head injuries, which included a swimming accident when he was 12 or 13 years old and a football injury when he was a senior in high school, [id. at 77-78], and then recounted his automobile accident on May 11, 2009, [id. at 79, 92-96].[62]  Minter

---

  [61] On cross-examination, Dr. Powell admitted that he had not evaluated Minter and that when he diagnoses malingering, he would typically evaluate the individual, interview him, review the medical reports, review collateral sources, and review the scientific literature prior to forming an opinion on whether the individual was or was not malingering.  [Doc. 83 at 188-89].  Dr. Powell also testified that retrograde amnesia usually resolved itself in a "fairly short period of time," and that Minter's case was not "the most common pattern."  [Id. at 190].

  [62] Minter testified that he would tell "everything that [he] believe[d he] remember[ed]," but that he had been told "a ton of stuff" and so he gets confused about what was "a memory as opposed to what [he was] told[.]"  [Doc. 83 at 79].

testified that while he was in the hospital, he "kept getting asked about the military" and "kept being told that [he] was in the military" because he had his uniform on but that he had no recollection of being in the Army or "how to do [his] job."  [Id. at 79-80].  He stated that when he woke up after the accident, he did not remember his wife, children, or his career in the Army.  [Id. at 80-81, 96].

When asked about "things [he had] to learn or . . . relearn since [his] accident," Minter testified:

> This May will be five years.  Obviously heard the one the washing of hands and things like that.  One report says I knew my IPhone or could do emails and stuff like that, those are things I learned.  Matter of fact, my wife and my brother and my parents had talked about, you know, it is just one of the very, you know, odd things that I used to always walk around with my phone.  After the accident I don't think I picked that up for a couple of weeks or longer.  I had no desire.  I had no desire to talk to anyone because I didn't know, I mean, I flipped through my little rolodex later trying to put who is who, who is this and who is that, and it was obvious I got tons of letters from, you know, friends and stuff like that.  Your honor, I probably have four friends now.

[Id. at 82].[63]

---

[63] Minter also testified that there had been times he wanted to walk away from his family and that he did not "need a wife and four kids, [he did not] remember having them" so he "went and got a tattoo of [his] wife on [his] arm because it would be something permanent and it would make it a lot harder for [him] to walk away."  [Doc. 83 at 88].  He further testified that he did not recall telling Dr. Mooney that he was an inpatient at Shepherd Center and that "maybe that got took out of context."  [Id. at 91-92].

On cross-examination, the government questioned Minter about his Army career.  [Id. at 96-97].  Minter testified that he did not recall any of his assignments of where he was stationed, but that he knew his military history because he had looked it up, though he had no memory of it.  [Id. at 97].  Minter testified as to his chronological military history, [id. at 97-98], and he then discussed his time in Saudi Arabia, stating that he knew he was a finance officer, but that he did not recall the people he used to work with, [id. at 98-99].  He stated that he was "very nervous" about the fact that he would not know who his co-workers were when he noticed "a lady sitting in the back of the courtroom and [he] just really wondered was that somebody [he] knew, [was] that somebody who [knew him]."  [Id. at 99].  Minter testified that he was informed in July, 2009, that he had been "flagged" and that he could not use government computers, but that he was "never told [] of an investigation."  [Id. at 108-09].  He stated that by October of 2009, however, it was clear to him that he was under investigation.  [Id. at 110].[64]

---

[64] Minter testified as to his course of treatment following his accident and stated that the doctors had advised him that his memory would return.  [Doc. 83 at 99].  He stated that Dr. Wilkie told him that it "could come back today, tomorrow. You could get your memory back in two months, two years, two days, two decades," but that Dr. Wilkie did not think he had lost his memories.  [Id.]. Minter also testified that he was awarded 50 percent disability since he was incapable of performing his job due to his memory loss and that he appealed that decision in an attempt to obtain 100 percent disability but it was denied.  [Id. at 100-03, 111-12]; (Gov. Ex. 15).  He stated that he was also awarded social security disability benefits and benefits from the Veterans Administration.  [Doc. 83 at 104-05, 112].

4.     *Legal Standard*

"A defendant has a due process right not to be tried or convicted while incompetent." United States v. Ramirez, 491 F. App'x 65, 71 (11th Cir. 2012) (per curiam) (unpublished) (citing Drope v. Missouri, 420 U.S. 162, 171–72 (1975)). "For a defendant to be competent to stand trial, he must have 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] ha[ve] a rational as well as factual understanding of the proceedings against him.'" Id. (alterations in original) (citation omitted) (quoting United States v. Rahim, 431 F.3d 753, 759 (11th Cir. 2005) (per curiam)). "The Eleventh Circuit has suggested a two-part analysis to evaluate competency to stand trial: (1) determination of whether the defendant suffered from a clinically recognized disorder, and, (2) if so, whether the disorder caused the defendant to be incompetent."[65]   United States v.

---

[65] Indeed, the "mere presence of a mental disease or defect is not sufficient to render a defendant incompetent" because "[i]ncompetency to stand trial is not defined in terms of mental illness" and "a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." United States v. Giraldo, No. 2:09–cr–85–FtM–36SPC, 2011 WL 7946037, at *2 (M.D. Fla. Oct. 24, 2011), adopted by 2012 WL 1890508, at *1 (M.D. Fla. May 23, 2012) (citations and internal marks omitted); see also United States v. Rinchack, 820 F.2d 1557, 1564 n.8 (11th Cir. 1987) (citations omitted) ("[A]mnesia alone does not *automatically* render a defendant incompetent.").   "To determine the competency to stand trial of a defendant suffering from amnesia, the trial court should evaluate the facts and circumstances of the defendant's impairment in light of the usual standard for determining competency." Rinchack, 820 F.2d at 1564 n.8 (citation omitted).   "[T]hat is, he must be able to consult with his lawyer with a reasonable degree of rational

Hall, No. CR 111–270, 2012 WL 899635, at *3 (S.D. Ga. Feb. 23, 2012), adopted by

2012 WL 899205, at *1 (S.D. Ga. Mar. 15, 2012) (citations and internal marks omitted).

"Neither the United States Supreme Court nor the Eleventh Circuit has

squarely addressed the issue of which party bears the burden of proof as to

competency." United States v. Allen, No. 10–80175–Cr, 2011 WL 4352793, at *20

(S.D. Fla. Aug. 26, 2011), adopted by 2011 WL 4352776, at *1 (S.D. Fla. Sept. 16, 2011).

In Cooper v. Oklahoma, 517 U.S. 348, 361-62 (1996), the United States Supreme Court

"indicated that the burden of establishing incompetence rests with the defendant,

but that indication was merely dictum." Allen, 2011 WL 4352793, at *20.   The

Eleventh Circuit, however, stated that the relevant competency statute, 18 U.S.C. §

4241, "arguably contemplates that the burden will lie with the party making a

motion to determine competency." United States v. Izquierdo, 448 F.3d 1269, 1276-

77 (11th Cir. 2006) (per curiam); see also United States v. Acosta-Soberanis, Criminal

Action File Nos. 1:09–CR–359–RWS–AJB, 1:09–CR–361–RWS–AJB, 2012 WL 1801978,

---

understanding and . . . [have] a rational as well as factual understanding of the
proceeding against him." Id. at 1569 (second and third alterations in original)
(citations and internal marks omitted).   Furthermore, "although medical
professionals properly determine whether a defendant has a disorder or is
malingering, competency is a legal concept," and "even if the experts' medical
conclusions of impaired ability are credited, the judge must still independently
decide if the particular defendant was legally capable of reasonable consultation
with his attorney and able to rationally and factually comprehend the proceedings."
United States v. Rothman, No. 08-20895-CR, 2009 WL 426282, at *6 (S.D. Fla. Feb. 19,
2009) (citation and internal marks omitted).

at *14 (N.D. Ga. Apr. 3, 2012), adopted by 2012 WL 1801680, at *1 (N.D. Ga. May 15, 2012). Here, the government points out that it was first to request a competency hearing, and concedes that it "carries the burden of proof in this case, to demonstrate by a preponderance of the evidence that [Minter] is in fact competent to stand trial." [Doc. 85 at 13 (citation omitted)]; <u>see also</u> [Doc. 91 at 48 (citation omitted) (Minter noting that the government "concedes that it bears the burden of proving that [he] is competent to stand trial in this case.")].[66] At the competency hearing, Minter acknowledged that he understood the charges against him and was aware of the different possible pleas and the participants at a trial. <u>See</u> [Doc. 82 at 34]. Thus, the issues in this case are whether Minter suffers from a clinically recognized disorder, and if so, whether it renders him incompetent due to an inability to assist in his own defense and consult with his counsel.[67]

---

[66] Minter asserts that the Court must determine "whether the government has proven by a preponderance of evidence that [he] is malingering his claims of retrograde amnesia." [Doc. 91 at 48 (citation omitted)]. However, the government, which has agreed that it has the burden of proof in this case, <u>see</u> [Doc. 92 at 1], must prove by a preponderance of evidence that Minter is competent to stand trial, not that he is malingering retrograde amnesia, <u>see</u> <u>Merriweather</u>, 921 F. Supp. 2d at 1290-91.

[67] Minter seeks to reopen the evidentiary hearing to allow the testimony of Drs. Abbay and Dobbins as well as to submit testimony and documentary evidence regarding the "medical significance of the enlarged Virchow-robin space detected by Dr. [] Wilkie in [his] January, 2010 MRI." [Doc. 91 at 47]. Minter also renews his objection to the Court's limited scope of Dr. Powell's testimony and "requests [] the opportunity to reopen the evidentiary hearing to permit Dr. Powell to offer

5.    *Analysis*

The government first argues that Minter does not suffer from a clinically recognized disorder or a mental disease or defect.  See [Doc. 85 at 15-29].  In particular, the government asserts that there is no medical or psychological explanation for Minter's alleged retrograde amnesia, and it relies on the expert

---

testimony pertaining to Dr. Dorney." [Id. at 47-48].  With regard to Drs. Abbay and Dobbins, the Court notes that their records have been submitted to the Court and are already in evidence, and that Minter has failed to offer any reason as to why their testimony could not have been obtained prior to the competency hearing. Additionally, Minter had the January of 2010 MRI in his possession prior to the evidentiary hearing and he similarly offers no explanation as to why this evidence, if even relevant, was not presented at the competency hearing.  Thus, Minter's request to reopen the hearing for these reasons is denied.  Furthermore, while Minter contends that this Court erred in limiting Dr. Powell's testimony for failing to comply with Rule 16 of the Federal Rules of Criminal Procedure, this Rule was specifically discussed at the competency hearing and the Court did not limit Dr. Powell's testimony on this basis.  See [Doc. 83 at 140-50].  Indeed, the Court limited Dr. Powell's testimony based on his qualifications, finding that he was not qualified to testify as to Dr. Dorney's opinions since he was not a psychiatrist, and that it was not proper for him to render any opinion regarding Dr. Flores and how she could not have reached her conclusions.  [Id. at 145-46, 149].  Instead, the Court found that Dr. Powell was qualified to render an opinion about psychological testing as he described it in his report, and in general, but that he was not to "critique Dr. Flores' decision."  [Id. at 149].  Minter has not offered any authority or persuasive arguments as to why these rulings were incorrect, and the Court finds that there is no sufficient basis to reopen the hearing in this regard.  See John McClelland & Assocs., Inc. v. Med. Action Indus., Inc., Civil Action No. 04-2545-CM, 2007 WL 1201478, at *4 (D. Kan. Apr. 23, 2007) (citation and internal marks omitted) (quoting Wilson v. Muckala, 303 F.3d 1207, 1218 (10th Cir. 2001)) ("The credibility of witness testimony is . . . generally is not an appropriate subject for expert testimony."); see also United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996) (per curiam). Accordingly, Minter's request to reopen the competency hearing is **DENIED**.

testimony provided by Drs. Dorney and Flores as support for this assertion. Specifically, the government points out that Dr. Dorney testified that the medical evidence revealed that Minter suffered a mild traumatic brain injury with no significant damage to his brain shown on scans, and that the medical doctors found that his retrograde amnesia was "unusual" and difficult to explain given his injuries. See [id. at 15]; see also [Doc. 82 at 35-40, 43, 48-49, 52-67, 148]. Dr. Dorney further noted that Minter's self-reported symptoms were inconsistent with retrograde amnesia since this type of amnesia typically resolves in three to six months, even in cases with "acute insult." [Doc. 82 at 43, 120-21, 132-33, 149-51]. After having ruled out a possible medical explanation for Minter's retrograde amnesia, Dr. Dorney then discussed the possible psychological diagnoses, including conversion disorder, dissociative amnesia, somatoform disorder, and factitious disorder, but she ruled those out for the reasons detailed in her testimony, which left her with the conclusion that Minter was malingering. See [id. at 40-45, 64, 72, 101-06, 115-19, 123-25, 133-36, 144-46]; see also (Gov. Ex. 5).

Similarly, Dr. Flores testified that the medical professionals had basically found that Minter's condition was not retrograde amnesia so it must be "some sort of psychological process,"[68] but that Minter's self-reported symptoms were

---

[68] Dr. Flores also testified that retrograde amnesia typically resolved and referenced a study that showed symptoms of retrograde amnesia resolved after 30

inconsistent with conversion disorder, dissociative amnesia, factitious disorder, and somatoform disorder.  [Doc. 82 at 167-70, 173-84, 191-92, 198-200].[69]  Based on her evaluation and psychological testing of Minter, along with her review of Minter's records, Dr. Flores concluded that a malingering diagnosis was appropriate.  [Id. at 165-66, 170-71, 209-10, 233, 236-37, 240]; see also (Gov. Ex. 11).[70]

---

minutes in 80 percent of 973 patients involved in the study.  [Doc. 82 at 175-76, 178, 196-97]; see also [Doc. 80-3].

[69] The government also contends that Minter's self-reported symptoms are not credible and points to various inconsistencies within the record as support, including the fact that Minter was using his iPhone within a month after his accident but that he reported to Dr. Sussman five months later that he had no prior knowledge of the Internet; that his last memory prior to the accident was taking his children to school but after the accident, he claimed not to remember them; that he reported to Drs. Kaelin and Mooney that he had recovered spontaneous memories but then reported to Drs. Dorney and Flores that he had not recovered any memories from his amnestic period; that he was able to provide historical information in his interview with Dr. Flores in a way that was inconsistent with a genuine case of amnesia as it was a lot of information to relearn in three years; and that he appeared to have no other psychological issues which according to Dr. Flores was inconsistent with someone who had lost twenty years worth of memories.  See [Doc. 85 at 22-25].

[70] Minter appears to claim that he suffers from conversion disorder and that his loss of memory could be the result of that disorder.  See [Doc. 91 at 40-43].  Drs. Dorney and Flores opined that Minter did not fit the diagnostic criteria for that disorder under the DSM-IV because he did not suffer a psychological trauma, he did not manifest a symptom or deficit affecting voluntary motor or sensory functions, and that even if he did, it would not explain his retrograde amnesia.  See [Doc. 82 at 40-44, 133-36, 144-46, 184, 221-23, 225-26, 230-21, 233].  Minter challenges Drs. Dorney and Flores' opinions that he does not fit the diagnostic criteria for that disorder by pointing to Dr. Powell's testimony, the fact that his medical records showed some motor function issues, and the fact that the current DSM-V revised the

Minter disputes Drs. Dorney and Flores' conclusions that he is malingering, arguing that "numerous doctors have examined [him] over the years and not one of them, with the exception of the government's experts, determined that [he] was malingering his symptoms of retrograde amnesia." [Doc. 91 at 50]. In response, the government emphasizes that, despite not using the words "faking," "[e]very medical doctor who examined [Minter] concluded that he suffered, at most, a mild traumatic brain injury," that the "doctors repeatedly noted that the severity of his claimed memory loss [could not] be explained by a mild brain injury," and that "[i]n the absence of a medical explanation, many of them have surmised that some sort of psychological disorder [may] be at issue." [Doc. 92 at 3 (<u>citing</u> notes from Drs. Kaelin, Wilkie, and Mooney)]. The government then points out that the mental health professionals who evaluated Minter, as well as Dr. Doane, the Chief of the

---

definition of conversion disorder to include that it is "often associated with . . . dissociative amnesia." <u>See</u> [Doc. 91 at 21, 40-45]. However, as the government points out, the tests that showed some motor impairments were performed in 2009 and 2010, and Drs. Dorney and Flores both noted that Minter had no current motor impairments when they evaluated him in 2012. <u>See</u> [Doc. 92 at 8]; (Gov. Exs. 5 & 11). Moreover, even Dr. Powell acknowledged that conversion disorder is caused by psychological trauma, <u>see</u> [Doc. 82 at 184], and here, there is no evidence of any psychological trauma, but rather that Minter suffered physical trauma to his head in the automobile accident. While the DSM-V revised its definition of conversion disorder to include dissociative amnesia after Drs. Dorney and Flores evaluated Minter, both experts testified that they considered dissociative amnesia as a diagnosis but that it occurs in relation to a psychologically traumatic event and causes loss of memory in relation to that trauma, which is typically anterograde amnesia, not retrograde amnesia. <u>See</u> [Doc. 82 at 41, 118, 146, 168-69].

Army Medical Review Board, "almost universally expressed skepticism about his claims and noted the complete lack of any objective evidence of amnesia." [Id. at 4-5 (citing notes from Drs. Sussman, Mooney, Dobbins, Abbay, and Doane)].

Minter also challenges Drs. Dorney and Flores' findings by pointing to Dr. Dobbins' notation that malingering should be considered and ruled out if it could be determined that Minter "was notified of the investigation of missing funds prior to his [motor vehicle accident] on [May 11, 2009.]" [Doc. 91 at 49]; see also (Def. Ex. O at 6). Minter argues that since the government cannot show that he was aware of the investigation prior to his May 11, 2009, accident, they have failed to show that he had a motive to malinger his retrograde amnesia. [Doc. 91 at 49]. However, the government points out that Minter was informed of the investigation of his actions in Saudi Arabia as early as July of 2009, and that he was certainly aware of it by October of 2009, which according to Drs. Dorney and Flores, and even his own expert, Dr. Powell, was during the window of time most people suffering from retrograde amnesia would recover their memory. See [Doc. 82 at 43, 98, 113-14, 218-19; Doc. 83 at 163].

It is undisputed that Minter suffered a mild traumatic brain injury as a result of the automobile accident, and there is a consensus among the many medical professionals who have examined him that the profound and prolonged retrograde

amnesia that he claims to suffer is atypical and not attributable solely to his physical injuries.  See (Def. Ex. B at 2; Def. Ex. E at 1; Def. Ex. F at 3-4; Def. Ex. H at 1; Def. Ex. K at 7-8; Def. Ex. L at 9-10; Def. Ex. M at 3).   In the absence of a medical explanation for Minter's alleged retrograde amnesia, the medical professionals have considered various possible psychological diagnoses, including conversion disorder, dissociative amnesia, somatoform disorder, and factitious disorder.  See (Def. Ex. E at 1; Def. Ex. F at 3-4; Def. Ex. I at 7; Def. Ex. K; Def. Ex. L at 10; Def. Ex. M at 3; Def. Ex. O at 6; Def. Ex. P at 4; Def. Ex. Q at 3).   Drs. Dorney and Flores persuasively testified that Minter fails to meet the diagnostic criteria for the various psychological conditions that have been posited as possible explanations for his alleged amnesia.  See [Doc. 82 at 36-46, 64, 72, 101-06, 115-19, 123-25, 133-36, 141, 144-46, 167-70, 173-84, 198-200, 221-26, 230-33].  By process of elimination of alternative explanations and for the additional reasons stated in their reports and testimony, Drs. Dorney and Flores have concluded that Minter is malingering.  See [id. at 35-36, 46, 141, 165-66, 209-10, 233, 236-37, 240]; (Gov. Exs. 5 & 11).

Recognizing the lack of a clear diagnosis for his retrograde amnesia,[71] Minter asserts that the Court "need not engage in the process of attempting to determine the cause of [his] retrograde amnesia, that is, whether it is due to his traumatic brain injury, conversion disorder, a combination of both, or some other reason." [Doc. 91 at 48-49 (emphasis omitted)].  However, in order to find Minter incompetent to stand trial, the Court must first determine whether he suffers from a "clinically recognized disorder."  See Bundy v. Dugger, 850 F.2d 1402, 1408 (11th Cir. 1988) (citation and internal marks omitted).  In the absence of a definitive diagnosis in the voluminous medical records presented at the hearing, coupled with the persuasive testimony of Drs. Dorney and Flores that Minter does not satisfy the diagnostic criteria for the various psychological conditions that have been posited as possible explanations for his alleged retrograde amnesia, there is no clear basis for the Court to find that Minter actually suffers from a clinically recognized disorder.  Instead, the Court is left with the parties' arguments that either Minter is, in fact, suffering from retrograde amnesia of unknown etiology or he is malingering.  However, neither of these options is entirely satisfactory.

_____

[71] In fact, even Minter's own expert, Dr. Powell, who did not evaluate Minter or review his medical records in detail, was unable to offer a specific diagnosis for Minter's retrograde amnesia.  Indeed, even Minter acknowledges that Dr. Powell simply testified that his "retrograde amnesia *could* very well be the product of a traumatic brain injury or a conversion disorder."  [Doc. 91 at 50-51 (emphasis added)].

On the one hand, to accept Minter's contention that he is suffering from intractable retrograde amnesia spanning twenty years of his life that has no definitive medical or psychological explanation, the Court ultimately must rely on Minter's testimony and his statements in the medical records regarding his lack of memory because there is no objective basis to determine whether a person is actually suffering retrograde amnesia.  See [Doc. 82 at 164, 167; Doc. 83 at 162, 186-87].  The government argues that there are several reasons to call into question the credibility of Minter's claim of persistent memory loss.  Among the more persuasive reasons are some inconsistencies pointed out by the government, see [Doc. 85 at 22-25], including that Minter reported to Drs. Kaelin and Mooney that he had recovered spontaneous memories, but then reported to Drs. Dorney and Flores that he had not recovered any memories from his amnestic period; that he was able to provide historical information in his interview with Dr. Flores in a fluid way that was inconsistent with a genuine case of amnesia; and that he appeared to have no other psychological issues which, according to Dr. Flores, was inconsistent with someone who had lost twenty years of his memory.  Indeed, the absence of any reported serious psychological issues arising from such a profound loss of one's memory of any relationship with his wife and children, his entire career, and all other life

experiences for a period of two decades is incredible, in one sense of the word or the other.[72]

An additional reason the Court has to question the credibility of Minter's claim is the personal stake he has in maintaining that he suffers from persistent retrograde amnesia. As the government notes, Minter is facing serious charges in this case, and he may avoid trial and possible conviction by claiming that he is incompetent. See [id. at 29; Doc. 92 at 6, 12-13]. He also is receiving disability benefits based in part on his claim of retrograde amnesia, see [Doc. 91 at 19-20], and the money he receives from these sources for himself and his family may be at risk should he report that he has recovered his memory and is able to work. Minter's stake in maintaining that he has retrograde amnesia that renders him disabled and incompetent to stand trial is certainly a factor the Court must consider in evaluating his credibility. See United States v. Ramirez-Chilel, 289 F.3d 744, 750 (11th Cir. 2002).

On the other hand, the difficulty with finding that Minter is malingering is pinpointing when he began to do so. One possibility that Dr. Dobbins proposed to be ruled out was that Minter has been malingering the entire time because he was

---

[72] Incredible is defined by Merriam–Webster Dictionary as "too extraordinary and improbable to be believed" or "amazing, extraordinary." Dictionary and thesaurus—merriam-webster online, http://www.merriam-webster.com (last visited June 13, 2014).

aware of the investigation prior to the automobile accident.  However, as Minter correctly contends, see [id. at 19], the government presented no evidence that he was aware of the investigation prior to the accident.  Nor has the government even advanced the argument that Minter was malingering from the beginning.[73]  Instead, in its post-hearing brief, the government has suggested that Minter began malingering after he was informed of the investigation in July of 2009 or certainly by October of 2009, when he was interviewed.  See [Doc. 92 at 6].  In other words, the government contends that, even if Minter did have some memory impairment as a result of the accident, he became aware of the investigation during the period of time the amnesia should have resolved, and he now has incentives to continue to claim that he is suffering from retrograde amnesia.  See [id.].  The government's argument is plausible, but there was no testimony from Drs. Dorney or Flores on the point at which Minter allegedly began to malinger.  Moreover, Dr. Wilkie noted that while Minter's retrograde amnesia was not typical, he did not believe that Minter could "voluntarily fake what he display[ed] clinically."  (Def. Ex. M at 3).  Indeed, Minter generally gave good effort on multiple psychological tests, and with the exception of Dr. Abbay's note about testing that was "suggestive of answering

---

[73] In fact, had Minter been malingering from the beginning, the automobile accident presumably would have been intentional, but the Army investigated Minter's accident and found that the proximate cause was not intentional misconduct or neglect.  See (Def. Ex. V).

questions dishonestly," (Def. Ex. P at 4),[74] he was not found to have malingered on testing.  If Minter has deliberately been pretending to have retrograde amnesia for several years, it seems improbable that there would be only one suggestion of possible deception found upon testing given the numerous times he has been examined.  Moreover, if Minter has been intentionally deceiving his family and friends about his memory loss, it seems there would be some indication of a personality disorder upon psychological testing, but none has been pointed out in this case.  See Battle, 235 F. Supp. 2d at 1306-07 (noting that malingering should be strongly suspected if any combination of particular factors, including the presence of antisocial personality disorder, are found).

After carefully considering all the evidence, medical records, and testimony from the competency hearing,[75] the Court cannot find that Minter suffers from a

---

[74] Minter points out that Dr. Abbay relied on Dr. Dobbins' neuropsychological testing and Dr. Powell testified that "[Dr.] Abbay's conclusion of [Minter's] supposed dishonesty in answering questions was predicated only on the MMPI score obtained by [Dr.] Dobbins and '[Dr.] Dobbins does not say [Minter] [answered dishonestly] in the test; therefore I don't know where she got it.'"  [Doc. 91 at 34, 45-46 (sixth alteration in original) (citation omitted)].

[75] The testimony of Minter's family and friends established that he was "different" after the accident and that he reported having no memory of past events, but as his brother-in-law acknowledged, these witnesses are not able to confirm whether Minter actually has amnesia or is faking memory loss.  See [Doc. 83 at 40]. The telephone conversation recorded by Agent Cole likewise is inconclusive because there are elements in the conversation that each side has pointed out in support of its position.

clinically recognized disorder because his alleged persistent retrograde amnesia following the automobile accident on May 11, 2009, has defied clinical explanation. While the Court shares the skepticism expressed by some of the medical professionals regarding the credibility of Minter's claim that he has absolutely no memory of twenty years of his life (which happens to encompass the time period at issue in the indictment) as a consequence of the mild traumatic brain injury suffered in the accident, and there are reasons to support finding that Minter may be malingering, in the absence of more definitive evidence that he began to deliberately deceive multiple medical professionals and everyone around him at some particular point in time after his accident, the Court is not prepared to rest its ruling at step one of the competency evaluation.  Accordingly, the Court "will assume for present purposes that [Minter] does in fact suffer from amnesia," <u>Rinchack</u>, 820 F.2d at 1569, and address whether the government has shown by a preponderance of evidence that despite his amnesia, he is still competent to stand trial.

"In this circuit[,] amnesia does not constitute incompetency per se to stand trial."  <u>United States v. Mota</u>, 598 F.2d 995, 998 (5th Cir. 1979)[76] (citation omitted). "The propriety of trying an amnesia defendant must be determined according to the

_____

[76] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

circumstances of each individual case." Id. (citation omitted); see also United States v. Swanson, 572 F.2d 523, 526 (5th Cir. 1978) (footnote omitted).  As previously explained, in order to determine whether a defendant is competent to stand trial, "the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding– and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960) (per curiam) (internal marks omitted).  The Eleventh Circuit has explained that in applying this standard to a defendant suffering from amnesia, the Court should assess the nature and extent of the impairment and consider its impact on the following factors: (1) defendant's ability to take the stand and testify and otherwise participate in his defense; (2) whether the amnesia is temporary or permanent; (3) whether the crime and defendant's whereabouts can be properly reconstructed without defendant's testimony, including any facts giving rise to a defense; (4) whether access to government files would aid in preparing for trial; and (5) the strength of the government's case against defendant.  Rinchack, 820 F.2d at 1569 (citations omitted).[77]

---

[77] "While these factors have a bearing on whether an amnesiac defendant is competent to proceed to trial, no particular set of factors is determinative," and the Court "must engage in a fact-specific inquiry which encompasses a review of the totality of the circumstances and varies depending on the crime and circumstances of each individual case." United States v. Marsee, Criminal Action No. 6: 04-73-S-DCR, 2006 WL 1464788, at *3 (E.D. Ky. May 22, 2006) (citations

Recognizing these factors and applying them to Minter's case, the government contends that Minter is competent to stand trial.  See [Doc. 85 at 29-32; Doc. 92 at 14-16].  There is no dispute that Minter understands the nature of the charges against him and that he is aware of the different available pleas and the participants at a trial, and that he is capable of taking the witness stand and testifying as he did at the competency hearing.  See [Doc. 82 at 34; Doc. 91 at 54].[78]  The government points out that Dr. Dorney testified that Minter had "very good verbal skills," that he was "clear and organized in his thinking," and that he had the "ability to learn new information that could be taught to him about his case" and that she therefore "did not see anything that would actually interfere with his ability to assist counsel." [Doc. 85 at 31 (internal marks omitted)]; see also [Doc. 82 at 34-35].  Similarly, Dr. Flores opined that Minter  had good verbal skills and that he possessed memory abilities to learn and retain information, see (Gov. Ex. 11), and Minter's testimony

––––––––––––––––––––

omitted).

[78] Instead, Minter asserts that the main issue is his ability to assist his attorney in his defense, maintaining that he would be unable to testify as to "any of the events surrounding the charges in the Indictment because he has no memory of those events," that he has "no knowledge or recollection to rebut any of the statements that may be made by witnesses for the government regarding [his] activities and the accounting and banking practices of the USMTM in 2006," and that he could not "assert a legal basis for his actions, or discuss his knowledge of his co-defendant's involvement, if any, in this alleged activity."  See [Doc. 91 at 54].

likewise demonstrated his abilities to relearn information in a short amount of time, to recall recent events, and to communicate clearly, [Doc. 83 at 75-112].

Moreover, this case centers around the alleged embezzlement of approximately $2.7 million of United States currency, which the government will attempt to prove largely through financial records and witness testimony, including a specific group of witnesses who worked with Minter in the finance office, and Minter has had access through discovery to the government's evidence to support the charges in the indictment.  See [Doc. 85 at 31; Doc. 92 at 15]; see also [Doc. 91 at 54]; United States v. Doke, 171 F.3d 240, 248-49 (5th Cir. 1999); United States v. Villegas, 899 F.2d 1324, 1342 (2d Cir. 1990) (finding that critical events could be reconstructed where "the government had indicated its willingness to make its files available to [defendant's] attorney, and there were a number of witnesses who could aid in the reconstruction of events").[79]  Minter maintains that he is unable to testify

---

[79] Furthermore, while "[g]ranting a continuance to a defendant whose amnesia has been diagnosed as temporary may materially increase his ability to stand trial[, i]f the amnesiac condition is unlikely to abate, the judge may question whether the defendant will ever be in any better position to stand trial," and "a presently competent defendant whose amnesia seems permanent would not benefit from a continuance; moreover, because the continuance would delay the trial[,] the recall of other witnesses would decrease, making it more difficult to give the amnesiac defendant a fair trial."  Swanson, 572 F.2d at 526-27.  Here, while the record is undisputed that retrograde amnesia typically resolves, the usual window for that to occur has since passed without any significant improvement in recall of the amnestic period by Minter's self-reports, and some of Minter's evaluating doctors have indicated that his amnesia would likely improve once his legal problems have

as to "any of the events surrounding the charges in the Indictment because he has no memory of those events," see [Doc. 91 at 54], but of course, Minter is not required to testify at trial or to present any evidence about the transactions, and Minter's counsel has not specified a particular defense to the charges that could be offered only if Minter's memory were fully intact.  There are witnesses other than Minter who can testify to the circumstances of the financial transactions at issue, including military personnel in the USMTM Finance Office, SAMBA employees, and potentially even his co-defendant Nock, who was Minter's deputy disbursing officer.  Likewise, Minter's wife and other family members presumably are available to confer with his counsel and perhaps testify about the approximately $197,431.11 in unexplained cash allegedly deposited into the bank accounts of Minter, his wife, and his in-laws, as well as the alleged acquisition by Minter and his family of various assets, including vehicles, boats, and real property with an additional $50,000 in unexplained cash.  See [Doc. 36-1 at 8 ¶ 9].

_____

resolved.  See (Def. Ex. L at 9-10; Def. Ex. O at 5-6; Def. Ex. P at 4).  Minter can receive a fair trial despite his amnesia since, as discussed above, the crime can be reconstructed without his testimony.  Swanson, 572 F.2d at 527; see also Wilson v. United States, 391 F.2d 460, 464 n.4 (D.C. Cir. 1968) (noting that defendant's awareness of his whereabout and activities at the time of the crime is not an essential ingredient of competence).  Finally, while one of the factors to be considered is the strength of the case against Minter, "no one set of factors is determinative of the issue" and, "[a]t this point, the Court cannot opine as to the strength of the government's case."  Marsee, 2006 WL 1464788, at *5 n.4.

In short, "[e]ven if [Minter's] reported loss of memory . . . is a genuine loss of memory, the Court notes that . . . he understands the nature and consequences of the proceedings against him" and "he has the present ability to communicate with his attorney and to discuss tactical trial decisions with him." Marsee, 2006 WL 1464788, at *5.   While Minter's "memory loss may prevent him from testifying at trial or providing his attorney with information that would form a defense, he is no more disadvantaged than other defendants who have either suffered memory loss or whose defenses may be impaired by other losses of evidence." Id. (citations omitted).[80]   Thus, while Minter "reportedly has no conscious memory of the alleged criminal activity, it appears that . . . his counsel can reconstruct the alleged crime or crimes without his testimony" and can "conduct his own independent investigation and [] cross examine the witnesses presented by the [government] at trial and explore their knowledge of or participation in the scheme." Id. at *6 (citations omitted).   Accordingly, under the particular circumstances of this case, it is hereby **RECOMMENDED** that Minter  be found **COMPETENT** to stand trial.

---

[80] Indeed, "the defendant's recollection is only one of many sources of evidence which may permit the reconstruction of a past event and [] extrinsic evidence far more valuable to the defense than the defendant's own testimony may be lost by reason of death, destruction or other fortuity prior to trial." United States ex rel. Parson v. Anderson, 354 F. Supp. 1060, 1072 (D. Del. 1972).

### III.  CONCLUSION

For the foregoing reasons and cited authority, Nock's motion to adopt Minter's initial reply brief, [Doc. 43], the government's motion to file a sur-reply, [Doc. 44], and Nock's motion to adopt Minter's sur-reply, [Doc. 51], are **GRANTED**, Minter's motion to exclude testimony, [Doc. 70], is **DENIED**, Minter's motion to supplement the record, [Doc. 80], is **GRANTED IN PART** and **DENIED IN PART**, and it is hereby **RECOMMENDED** that defendants' motion to dismiss the indictment, [Doc. 19], be **DENIED** and that Minter be found **COMPETENT** to stand trial.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. Accordingly, it is **ORDERED** and **ADJUDGED** that this case is hereby certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 17th day of June, 2014.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE