IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION FILE |
| v. | ) | |
| | ) | NUMBER 3:12-cr-4-TCB-RGV |
| JASEN C. MINTER and | ) | |
| LOUIS E. NOCK, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

This matter is before the Court on Defendant Jasen Minter's

objections [103] to Magistrate Judge Vineyard's Report and

Recommendation ("R&R") [95], which recommends that Defendants'

motion to dismiss the indictment [19] be denied and that Minter be found

competent to stand trial.

A district judge has a duty to conduct a "careful and complete" review

of a magistrate judge's R&R.  *Williams v. Wainwright*, 681 F.2d 732, 732

(11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th

Cir. 1982)).[1]  This review may take different forms, however, depending on whether there are objections to the R&R.  The district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).  The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990).  In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error.  *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

"Parties filing objections must specifically identify those findings objected to.  Frivolous, conclusive or general objections need not be

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing the continuing validity of *Nettles*).

[2] *Macort* dealt only with the standard of review to be applied to a magistrate's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Thus, district courts in this circuit have routinely applied a clear-error standard to both.  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases).  This is to be contrasted with the standard of review on appeal, which distinguishes between the two.  *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

The Court has conducted a careful, de novo review of the R&R and Minter's objections thereto. Having done so, the Court finds that Magistrate Judge Vineyard's factual and legal conclusions were correct. Minter objects to (1) the determination that the Court's order tolling the

3

statute of limitations covered both of the Government's requests for foreign assistance under 18 U.S.C. § 3292; (2) the determination that the statute of limitations remains tolled and that the indictment was therefore timely; and (3) the conclusion that Minter is competent to stand trial.  The Court addresses these issues below and finds that this Court's tolling order embraced the Government's two foreign requests and that the statute of limitations remains tolled.  The Court also agrees that Minter, despite extensive and incongruous evidence of his alleged amnesia, is competent to stand trial.

## I.    Background

Captain Jasen Minter and Sergeant First Class Louis Nock, were U.S. Army finance officers assigned to the finance office at the U.S. Military Training Mission ("USMTM") in Saudi Arabia.  Minter and Nock are charged with embezzling more than $2.7 million from U.S. government accounts held by the Saudi American Bank ("SAMBA") in Riyadh.  In 2006, Defendants allegedly withdrew large sums of cash from the U.S. military's SAMBA account, which they were responsible for transferring to the USMTM finance office vault.  Instead, Minter and Nock purportedly sent the currency back to the United States for their personal use.  Roughly two

4

years later, the U.S. Department of Defense conducted two audits of the USMTM and discovered that over $2.7 million was missing from the SAMBA account.  The discrepancies between SAMBA account withdrawals and corresponding cash vault deposits were traced to the 2006 dates during which Minter and Nock served as finance officers.  Subsequent investigation revealed significant amounts of unexplained income as well as cash purchases of real property and tangible assets by the Defendants and their families following their return to the United States.

The indictment charges Minter and Nock in count one with conspiracy to commit theft of government property between June 10, 2006 and May 8, 2007, in violation of 18 U.S.C. § 371; in counts two and three with embezzlement of government property on June 12, 2006 and August 30, 2006, in violation of 18 U.S.C. §§ 641 and 642; and in counts four and five with concealment of stolen government property between June 12, 2006 and December 5, 2006, and between August 30, 2006 and December 5, 2006, both in violation of §§ 641 and 642.  Each of these charges is subject to a five-year statute of limitations.  *See* 18 U.S.C. § 3282. Therefore, the statute of limitations was set to run with respect to count one

on May 8, 2012; with respect to counts two and three on August 30, 2011;
and with respect to counts four and five on December 5, 2011.

Special Agent David Outlaw of the U.S. Army Criminal Investigation
Command was responsible for investigating Minter and Nock's alleged
scheme. The investigation required bank records and other information
from SAMBA officials located in Saudi Arabia. On February 28, 2011, the
Government made an official request to the Kingdom of Saudi Arabia
("KSA") for assistance with its investigation. The request sought interviews
with three bank employees: Fahad Al-Athel, Bassim Al-Subiheen, and
Ahmed Alniam.[3] In the meantime, Agent Outlaw traveled to Saudi Arabia
and continued his investigation. With the help of SAMBA's legal counsel,
he identified additional SAMBA employees involved in the cash
withdrawals at issue, so he made a follow-up request to the KSA for
additional interviews. The follow-up request asked KSA officials to
interview Mamdouh Al Ali, Bandar Alobedam, and Mohammed Al-qassim.
This second request was transmitted to KSA officials on October 11, 2011.[4]

_____

[3] The official request for foreign legal assistance was made by the Office of
International Affairs of the U.S. Department of Justice ("OIA") to the Ministry of
Foreign Affairs for the KSA. [36-1]

[4] The Government has stated, and Defendants do not challenge, that Agent
Outlaw sent an official request for additional interviews to Saudi Arabian officials on or

On October 19, 2011, still working to complete its investigation and having received no response from the KSA regarding either of its requests, the Government applied to toll the statute of limitations.[5]  The Government's application included a detailed summary of the investigation to that point as well as confirmation of its official requests for information made to KSA authorities.  Pursuant to 18 U.S.C. § 3292, the Court suspended the statute of limitations from the date of the first foreign request, February 28, 2011, through the period authorized by statute.

On May 1, 2012, Minter and Nock were indicted.

## II.   The Statute of Limitations

Where a criminal prosecution depends on obtaining evidence from a foreign jurisdiction, provided the Government meets the conditions of

---

around August 29, 2011, but that the request was not forwarded from the legal attaché with the U.S. Embassy in Saudi Arabia to the appropriate KSA law enforcement officials until October 11, 2011.

[5] As of its October 2011 application to this Court to suspend the statute of limitations, investigators in the United States had not received any response from the KSA.  Unknown to them at the time, the KSA had in fact transmitted a response on September 25, 2011, but that initial response was not received by Agent Outlaw and Department of Justice officials until December 2011.  The KSA's September 25th correspondence contained interview summaries for Fahad Al-Athel, Bassim Al-Subiheen and Ahmed Alniam (the subjects of the original February 2011 request) and for Mamdouh Al Ali and Bandar Alobedam (two of the three subjects of the supplemental October 2011 request).  Notably absent from the KSA's response was an interview with, or even reference to, Mohammed Al-qassim, a former SAMBA bank teller who handled one of the withdrawals at issue.

section 3292, the statute of limitations may be extended for up to three years.  *See* § 3292(a); *United States v. Torres*, 318 F.3d 1058, 1059 (11th Cir. 2003) (section 3292 "permits the tolling of the limitations period so that the government may pursue an official request for evidence located in a foreign country.").  Defendants argue that the Government has not met those conditions and that prosecution is therefore time-barred.  The Government, for its part, contends that it has met the conditions of Section 3292, that the statute of limitations was properly tolled and remains tolled, and that the indictment was therefore timely.  The Court agrees.

Section 3292 provides in relevant part:

**(a)(1)** Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

**(b)** Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

**(c)** The total of all periods of suspension under this section with respect to an offense—

**(1)** shall not exceed three years; and

**(2)** shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

The Government's application to suspend of the statute of limitations was accompanied by sworn declarations from Agent Outlaw and Dan Stigall, an attorney with the OIA, in which they detailed the investigation and confirmed the official requests that had been made to the KSA for interviews with six SAMBA employees.  The Court considered the Government's application and carefully reviewed both declarations.[6] Finding by a preponderance of the evidence that an official request had been made and that evidence of the alleged offenses reasonably appeared to be located in the KSA,[7] the Court suspended the statute of limitations

---

[6] The Court acknowledges that the Government's application referred to its formal requests to the KSA in the singular form ("an official request"), referencing only its February 2011 foreign request.  But the sworn declaration of Agent Outlaw clearly identified a second, follow-up request in October 2011.  The Court does not have any reason to believe that the Government was misrepresenting to the Court that a second formal request was made through the legal attaché at the U.S. Embassy in Saudi Arabia.

[7] "A plain reading of § 3292 demonstrates that a district court's decision to suspend the running of the statute of limitations is limited to two considerations: (1)

noting that "the tolling began February 28, 2011," the date on which the *first* official request was transmitted to the KSA.

Defendants do not dispute that the statute of limitations was properly tolled. They object to whether Agent Outlaw's October 2011 request to the KSA is within the scope of the Court's tolling order and in any event, when that tolling ended.

## A.    Scope of the Tolling Order

As required by statute, the Court granted the Government's October 2011 application and tolled the statute of limitations from the date of the original request. *See* § 3292(b). The Government's application and the Court's order make reference to "an official request" having been made "on or about February 28, 2011." [36-1]. There is no dispute that the Government's application made no formal reference to the October 2011 follow-up request to the KSA. But an application under section 3292 must be accompanied by supporting documentation. The Court is foreclosed from basing its decision on an unsworn application alone. Paragraph 3 of the Court's order expressly identifies and endorses the sworn declaration of

---

whether an official request was made; and (2) whether that official request was made for evidence that reasonably appears to be in the country to which the request was made." *United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir. 2012).

Agent Outlaw, which summarized the investigation for the Court, and provided notice of his October 2011 follow-up request.

A motion to suspend the statute of limitations must be supported by "something of evidentiary value—that is, testimony, documents, proffers, and other submissions bearing some indicia of reliability . . . ." *United States v. Trainor*, 376 F.3d 1325, 1332 (11th Cir. 2004).  An unsworn application is not enough; the government must submit, and the Court will review, accompanying documents.[8]

Both of the Government's official requests, originally in February 2011 and again in October 2011, were disclosed to the Court in Agent Outlaw's sworn supporting declaration.  The Court's order therefore embraced both requests.[9]  Indeed, the Court was compelled to review and base its order on the declarations of Agent Outlaw and Stigall.  The Court could have not found by a preponderance of the evidence that a request had

---

[8] *See Broughton*, 689 F.3d at 1273; *United States v. Arrington*, No. 8:13CR146, 2013 WL 5963140 at *6 (D. Neb. Nov. 7, 2013) ("The sworn declaration of [the investigator] sufficiently outlined the investigation . . . . A sworn declaration has evidentiary value.").

[9] *United States v. Swartzendruber*, No. 3:06-cr-136, 2009 WL 485144 (D.N.D. Feb. 29, 2009) (single tolling order from the district court tolled the statute of limitations until a complete response was received on all pending requests, where the Government made initial and follow-up requests to multiple foreign governments, some completed and others outstanding at the time of application).

been made and that evidence reasonably appeared to be in a foreign country based on the unsworn application alone.  The Court's tolling order contemplated both the February 2011 request for interviews with Fahad Al-Athel, Bassim Al-Subiheen and Ahmed Alniam and the October 2011 follow-up request for interviews with Mamdouh Al Ali, Bandar Alobedam and Mohammed Al-qassim.  The statute of limitations was therefore tolled until the Government received complete and final response from the KSA on both requests, or in any event for not more than three years.

### B.    Final Action

Under section 3292, "a period of suspension . . . shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes *final action* on the request."  § 3292(b) (emphasis added).  Defendants argue that on September 25, 2011, when the KSA transmitted a formal response with interview summaries for five of the six requested SAMBA employees, the KSA took "final action."  If so, the statute of limitations ended not more than six months later, on or around March 25, 2012.  *See* § 3292(c)(2).  This would render Defendants' May 1, 2012 indictment untimely.

The KSA's initial response in September 2011 provided interview summaries for only five bank employees: Fahad Al-Athel, Bassim Al-Subiheen, Ahmed Alniam, Mamdouh Al Ali and Bandar Alobedam. Because the Government requested interviews with six individuals, the response was incomplete.  Having recognized this, it would have been preferable for the Government to return to the Court for an extension of the suspension period.  This would have entrusted to the Court the determination as to whether the KSA's response was incomplete or whether the response should be considered final, thus ending the tolling period.

But in *Torres*, the Government made an initial request for foreign investigatory assistance to the Isle of Man.  The Government then applied to the district court to toll the statute of limitations.  Roughly four months later, the Government received a reply from the Isle of Man stating, "Enclosed is the information you require."  But the enclosures were missing several requested documents.  Without requesting an extension of its motion to toll the statute of limitations, the Government simply renewed its request with foreign officials, identifying the documents that it still had not received.  The court clearly noted that the "better practice" would have been for the Government to have requested an extension of the suspension

period rather than reserving to itself the determination that the foreign response was not a complete and final action.  But despite being preferable, the Eleventh Circuit declined in *Torres* to create a test that *requires* the Government to reapply for an extension of the suspension period.[10]

Although "final action" by the foreign authority determines the end of the tolling period under section 3292, the statute does not define "final action."  The Eleventh Circuit has determined that "'final action' for the purposes of § 3292(b) occurs when a foreign court or authority provides a dispositive response to *each* of the items listed in the government's official request for information."  *Torres*, 318 F.3d at 1065 (emphasis added).

The Government's two requests to the KSA sought interviews with six individuals.  The KSA's September 25, 2011 response provided interview summaries for only five individuals, answering each of the demands from the February 2011 request, but failing to fully respond to the October 2011

---

[10] In *Torres*, the Government's original application made no mention of the need for subsequent or follow-up requests to the foreign government.  Torres argued that this placed supplemental requests outside the scope of the district court's suspension order. *Torres*, 318 F.3d at 1064 n.9.  The Government in that case, unlike the case at bar, conceded that the suspension order applied only to its initial request, but because its supplemental request sought items specifically covered by the original request, this brought it within the scope of the first request.  The court was persuaded, noting that "[t]he purpose of the statute is to make foreign-kept business records more readily admissible" and "to facilitate, not turn into a game, the cumbersome process of obtaining evidence from foreign governments." *Id.* (citations omitted).

14

request.  KSA officials have never made it clear that they have taken final action vis-à-vis Agent Outlaw's October 2011 follow-up request, and it is indisputable the request for an interview with Mohammed Al-qassim remains open today.  Final action has not taken place when a witness cannot be located and interviewed.  *United States v. Trainor*, 277 F. Supp. 2d 1278, 1284-85 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1325 (11th Cir. 2004).

Defendants challenge the Court's reliance on *Trainor*, where the Swiss government responded to a formal Government request by indicating that they could not locate the Swiss citizen whom the U.S. sought and requesting additional information about his whereabouts.  The Swiss request for more information was not deemed final action as the Swiss government was explicitly asking for more information in order to comply with the request.  Admittedly, the KSA's formal September 2011 response does not request additional information from U.S. authorities regarding Al-qassim.  Indeed, it makes no reference to Al-qassim at all.  It does not indicate that it considers the matter closed, nor does it address any

cessation of efforts to locate and interview him.[11] As to the specific request to interview Al-qassim, the KSA has not yet taken final action.

Courts have expressed concern about delegating to prosecutors the power to determine when "final action" has occurred. But the KSA's inability to track down and interview Al-qassim does not provide the Government with the ability to indefinitely toll the statute of limitations. In section 3292(c)(1), Congress placed an ultimate three-year limit on the suspension period, which "safeguards" against the "unlimited discretion" of the prosecutor. *Torres*, 318 F.3d at 1064.

Applying the Eleventh Circuit's broad construction of "final action" and having determined that the Government's application to suspend the statute of limitations encompassed both of the requests disclosed by Agent Outlaw, the Court finds that the KSA has not yet provided a "dispositive

---

[11] Defendants argue that the KSA's response, which states, "the relevant authorities . . . have acted upon and accomplished the request of American authorities as enclosed in the attached envelope," [36-4] is evidence of final action on its part. Even if the Court were to interpret the letter as reflecting the KSA's opinion that it had taken final action, this Circuit does not condition a finding of final action on a foreign government's subjective opinion. Final action turns on an objective assessment of whether the responding country's submissions were, in fact, complete. *Torres*, 318 F.3d at 1063 (citing *United States v. Meador*, 138 F.3d at 995-96 (5th Cir. 1998) (Jones, J., dissenting) (finding that the Fifth Circuit's subjective test of a foreign government's determination that it has fully complied with a request "undermin[es] the intent of Congress" as it is contrary to section 3292's principal purpose, which is to more easily facilitate the process of obtaining evidence from foreign governments)).

response to each item listed in the official request." *Id.* Until the Government received a dispositive response regarding Mohammed Al-qassim, the statute of limitations remained tolled for no more than three years, until February 2014. The May 1, 2012 indictment of the Defendants was therefore timely.

## III.   Minter's Competency

Minter next objects to the magistrate judge's determination that he is competent to stand trial. He maintains that as a result of a car accident in May 2009, he suffers from retrograde amnesia covering roughly a twenty-year period. Because this period of assumed memory loss overlaps with the years of the alleged crimes, he insists that he is incompetent to stand trial. The Court has undertaken a careful de novo review of this portion of the R&R. Magistrate Judge Vineyard has capably explained and applied the test for determining competence, and his conclusions are correct.

The Court thoroughly reviewed Minter's medical records, psychological evaluations, and testimony from the two-day competency hearing. Despite the fact that Minter's alleged retrograde amnesia is, according to medical professionals, unusual, inconsistent with his injury and seems to defy clinical explanation, the Court cannot conclude with

certainty that he is in fact malingering.  Thus, the Court assumes that he does suffer from amnesia and addresses only whether, despite his amnesia, he remains competent to stand trial.

Minter argues that "the [G]overnment has not carried its burden to show that Defendant's lack of memory has *no bearing* on Defendant's ability to assist [] counsel in this case." [103] at 15 (emphasis added).  The standard for competence is not this high.  The Court need only find that Minter is able "to consult with his lawyer with a reasonable degree of rational understanding and . . . [have] a rational as well as factual understanding of the proceedings against him." *United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir. 1987) (quoting *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam).

Amnesia does not constitute incompetency per se, and "[t]he propriety of trying an amnesia defendant must be determined according to the circumstances of each individual case." *United States v. Mota*, 598 F.2d 995, 998 (5th Cir. 1979) (internal citation omitted).  The Eleventh Circuit has explained that the Court should evaluate the nature and extent of the impairment and consider its impact on the following factors:

> (1) The defendant's ability to take the stand and testify and otherwise participate in his defense; (2) whether the amnesia is

18

> temporary or permanent; (3) whether the crime and the defendant's whereabouts can be properly reconstructed without the defendant's testimony, including any facts giving rise to a defense; (4) whether access to government files would aid in preparing for trial; and (5) the strength of the government's case against the defendant.

*Rinchack*, 820 F.2d at 1569 (citations omitted).

As to the first factor, it is undisputed that Minter understands the nature of the charges against him, has a present ability to consult with counsel, and is capable of testifying on his own behalf. Indeed, Minter lucidly testified before the Court at his competency hearing. His testimony confirmed the notes and opinions of clinicians who have examined him; he has good verbal skills, can retain and re-learn information quickly, and he communicates clearly.

Minter insists that he cannot testify to "any of the events surrounding the charges in the indictment because he has no memory of those events." [91] at 54. But there is no requirement that a criminal defendant take the stand at trial. "While [his] memory loss may prevent him from testifying at trial or providing his attorney with information that would form a defense, he is no more disadvantaged than other defendants who have either suffered memory loss or whose defenses may be impaired by other losses of evidence." *United States v. Marsee*, Criminal Action No. 6: 04-73-S-DCR,

2006 WL 1464788, at *5 (E.D. Ky. May 22, 2006); *see United States v. Stevens*, 461 F.2d 317, 320 (7th Cir. 1972) (comparing the plight of an amnesiac to that of a defendant "who was home alone, asleep in bed, at the time of the crime or a defendant whose only witnesses die or disappear before trial.").

The second factor directs the Court to evaluate whether the defendant's amnesia is permanent or temporary.  The record is undisputed that retrograde amnesia typically resolves—but Minter's memory has not improved as expected, and he reports no substantial progress in his ability to recall events from the forgotten twenty-year period.  Where a defendant's amnesia is considered temporary, the granting of a continuance "may materially increase his ability to stand trial."  *United States v. Swanson*, 572 F.2d 523, 526 (5th Cir. 1978).  But "a presently competent defendant whose amnesia seems permanent would not benefit from a continuance." *Id.*  As the court noted in *Swanson*, delaying trial would hinder the recall of other witnesses and render it more difficult for the defendant to reconstruct events and present a defense.

The alleged crime and Minter's whereabouts can be reconstructed without his testimony, and the Government has indicated its willingness to

provide access, through discovery, to files that would aid his counsel in preparing for trial.  Consideration of factors three and four therefore militates in favor of finding Minter competent.  The Government maintains that through financial records, bank reports, depositions and testimony of witnesses who worked in the finance office with Minter, the alleged crimes can be reconstructed.  Not only is defense counsel free to conduct its own independent investigation, but discovery has provided Minter with the Government's evidence against him, allowing him to reconstruct the events at issue.  *See United States v. Villegas*, 899 F.2d 1324, 1342 (2d Cir. 1990) (finding that "critical events . . . could be reconstructed because the government had indicated its willingness to make its files available to [the defendant's] attorney, and there were a number of witnesses who could aid in the reconstruction of events . . ."); *see also United States ex. rel. Parsons v. Anderson,* 354 F. Supp. 1060, 1071-74 (D. Del. 1972) (the "defendant's recollection is only one of many sources of evidence which may permit the reconstruction of a past event and that extrinsic evidence far more valuable to the defense than the defendant's own testimony may be lost by reason of death, destruction or other fortuity prior to trial."), *aff'd,* 481 F.2d 94 (3rd Cir. 1973).

Minter fails to advance a compelling argument as to why access to the Government's evidence against him, knowledge of the limited number of individuals who actually worked in the USMTM office in Riyadh in 2006 and 2007, and possession of personal bank records, financial accounts, travel itineraries and correspondence between him and family members would not be sufficient to reconstruct the alleged crimes. Instead, he casts doubt on the admissibility at trial of certain financial documents, and he questions the Government's ability to secure the testimony of cooperative witnesses. The Court declines to speculate about potential evidentiary issues and has satisfied itself that investigation, discovery and access to the Government's evidence against him will allow Minter to reconstruct the crimes of which he is accused.

Finally, Minter implicitly argues that to evaluate the strength of the Government's case the Court should provide a detailed account of the evidence against him. And it is true that an incredibly strong case against the defendant may make his own testimony less critical than in a weaker case. *Swanson*, 572 F.2d at 527. But the Court need not find that the evidence is "overwhelming," nor is this factor dispositive. The Government has presented strong circumstantial evidence connecting the defendant to

the crime.  *Id.*  Copies of emails and eyewitness accounts confirm the withdrawals made by Minter and Nock.  Minter's signature appears on the withdrawal slips.  Financial account investigation establishes the shortfall in USMTM accounts corresponding with Minter's withdrawals in 2006. Sonya Nock, the wife of Minter's co-defendant, has advised investigators that she received DHL packages containing U.S. currency in 2007, not long after the un-accounted withdrawals.  Moreover, investigation of the Defendants and their families revealed significant and unexplainable cash deposits and purchases during the same period.  The fifth factor is not determinative, nor must the Government's case be a slam dunk—but the Government's case is strong, and along with the other factors, alleviates the importance of Minter's own testimony.

Minter has the ability to consult with counsel and fully understands the nature of the proceedings against him.  Having applied the factors set forth in *Rinchack*, the Court finds Minter competent to stand trial.

## IV.   Conclusion

Accordingly, the Court ADOPTS AS ITS ORDER the Report and Recommendation [95], DENIES Defendants' motion to dismiss the indictment [19] and finds Minter competent to stand trial.

IT IS SO ORDERED this 19th day of September, 2014.

Timothy C. Batten, Sr.
United States District Judge